IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:18-CR-00735 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| MOHAMMAD MOHAMMAD, | ) | GOVERNMENT'S RESPONSE TO |
| | ) | DEFENDANT MOHAMMAD |
| Defendant. | ) | MOHAMMAD'S EXPERT REPORT |
| | ) | |

Now comes the United States of America, by and through its attorneys, Justin Herdman, United States Attorney, and Carmen E. Henderson and Megan R. Miller, Assistant United States Attorneys, and respectfully submits this Response to Defendant MOHAMMAD MOHAMMAD'S Expert Report (Ex. A) setting forth the United States' position regarding the loss amount in this matter.  For the reasons set forth below and those to be articulated at the sentencing hearing, the United States respectfully requests that the Court find that the loss amount from Defendant's conduct is $498,189.

## I.    FACTUAL BACKGROUND

To support its sentencing position, the United States offers the following summary of the Defendants' conduct.  The United States also refers the Court to the description included in the PSR.  (Doc. # 32 at 7-18).

A. <u>Food Stamp Fraud Investigation</u>

Defendant and his brother Omar Mohammad were partners of the Muhammad Brothers Partners.  Muhammad Brothers Partners was the purported parent company for Holyland Imported Foods, Inc. ("Holyland") with its principal place of business located at 11717 Lorain Avenue, Cleveland, Ohio.  Holyland is a specialized grocery store. In or around 2009, the United States Department of Agriculture Office of Inspector General ("USDA OIG") along with the Ohio Department of Public Safety, Cleveland Police Department and a few other agencies identified "problem businesses" that they believed were engaging in food stamp fraud.  (Case 1: 16-CR-52, Sent. Tr., Doc. #87 at 38.)  Holyland was identified as one of these problem businesses because over the course of a few years, the Ohio Department of Public Safety had collected several statements from individuals who admitted to exchanging food stamp benefits for cash and other non-food items at Holyland.  (<u>Id.</u>)  Then, in or around 2010 or 2011, USDA OIG began investigating two brothers who operated four convenience stores and a restaurant in Cleveland, for allegations of food stamp fraud.  (<u>Id.</u> at 39.)  Through that investigation USDA OIG learned that the brothers and their employees were permitted to use multiple food stamp cards to purchase food at Holyland for their restaurant.

Based on that information, USDA OIG directed multiple cooperating witnesses to Holyland in an attempt to engage in fraudulent food stamp transactions.  (<u>Id.</u> at 48.)  As part of the investigation, four cooperating witnesses were provided with controlled food stamp cards and audio and video recording devices.  (<u>Id.</u> at 48-49.)  The cooperating witnesses were then sent into Holyland to attempt to engage in unauthorized food stamp transactions.  (<u>Id.</u>).  The Defendant, his brother, and their employees permitted the cooperating witnesses to engage in four types of unauthorized food stamp transactions, including: (1) exchanging food stamps for non-food items

such as tobacco products; (2) allowing cooperating witnesses to purchase large quantities of food with knowledge that it would be used in the witness's restaurant; (3) allowing cooperating witnesses to use multiple food stamp cards at one time; and (4) extending the cooperating witnesses credit for food stamp benefits to be used on future purchases.  (Id. at 65, See Ex. 9).

As a result of the unauthorized transactions with the cooperating witnesses, USDA OIG executed search warrants at Holyland and the Defendant's residence on October 15, 2014.  (Id. at 55).  During the searches, the agents obtained four notebooks, which contained ledgers of credit extended to customers at Holyland, including credit extended for food stamp benefits.  (Id. at 55, 67).  Additionally, at Defendant's residence, the agents seized coffee bags of adding tapes with Holyland cash register receipts, and supporting documentation noting the credit card and food stamp sales attached.  (Case 1:16-CR-52, Sent. Tr., Doc. #88 at 18-22).

B.  Tax Fraud Investigation

Internal Revenue Service Criminal Investigations Special Agent Ellen Lacy ("SA Lacy") spoke to employees at Holyland and learned that all sales were entered into the cash register. (Id. at 24).  Therefore, SA Lacy determined that the cash register receipts should be an accurate representation of the sales made in the store on each day.  (Id.).  SA Lacy seized cash register receipts from 2009 through 2013.  (Id.).  However, she did not obtain enough cash register receipts to document Holyland's sales for 2009-2011.  (Id.).  SA Lacy received every single cash register receipt for 2013 and the majority of the receipts from 2012.  (Id.).  SA Lacy added up the cash register receipts from 2012 and 2013 and calculated Holyland's total sales in those years. (Id. at 28).  SA Lacy compared the total sales amount she calculated from the register receipts to the total sales reported on the Defendant and his brother's tax returns and determined that the defendant and his brother substantially underreported their income in 2012 and 2013.  (Id. at 27).

SA Lacy interviewed  Defendant and his brother's accountant, Abdullah Jordan ("Jordan").  (Id. at 29).  Jordan stated that Defendant provides him with the information to complete the Muhammad Brothers Partners' Form 1065 partnership tax return as well as Defendant and his brother's Form 1040 income tax returns.  (Id.).  Additionally, he stated that Defendant told him that all of Holyland's income is deposited into the business bank account and that he was not aware of any income not deposited into the Holyland business bank account. (Id.). Therefore, Jordan stated that he relies on the Holyland business bank account to calculate the business's income.  (Id.).  After calculating the Defendant and his brother's share of the unreported income, an IRS revenue agent calculated the tax due and owing based on the unreported income.  (Id. at 30-32).

## II.    GOVERNMENT'S LOSS CALCULATION

IRS-CI determined the partnership tax returns that were filed with the IRS on behalf of Holyland for the taxable years 2012 and 2013, as well as the respective individual federal income tax returns for Defendant Mohammad Mohammad and Omar Mohammad filed therewith for said taxable years, were false and/or fraudulent insofar as they understated the total amount of gross receipts or sales generated by the business operations of Holyland each taxable year.  As a result, the returns understated the total amount of partnership income Defendant Mohammad Mohammad and Omar Mohammad ultimately received from those business operations. Defendant failed to report approximately $1,550,607 of Holyland's income on the Muhammad Brothers Partners U.S. Return of Partnership Income, Form 1065, for the 2012 and 2013-tax year.  This resulted in an additional tax due and owing of approximately $498,189.

More specifically, Defendant caused Muhammad Brothers Partners to underreport gross receipts on its Return of Partnership Income, Form 1065, for tax years 2012 and 2013.  Based on

information received solely from the Defendant, Jordan, Defendant's accountant, calculated Holyland's sales based only on deposits into the Holyland checking accounts.  Cash register tapes seized from Defendant's residence revealed, however, that not all of Holyland's income was deposited into the business bank accounts, thus resulting in unreported income.

To determine the actual income, IRS-CI calculated Holyland's gross receipts using both sales receipts reflected on the cash register tapes and the deposits into the Holyland business accounts. The table below summarizes the gross sales computations identified during the investigation compared to the gross sales reported on the partnership income tax returns.  The below calculated unreported income was omitted and should have been included on Line 1a, Gross Receipts or Sales, on the Form 1065 partnership income tax returns filed by Defendant for Holyland.

|  | 2012 | 2013 | Total |
|---|---|---|---|
| Sales as per Cash Register Receipts | $ 3,321,854.61 | $ 5,323,561.06 | |
| World Pay[1] Deposits for the Period in which No Sales Receipts were Recovered During Search Warrants | $    817,505.92 | $         0 | |
| GROSS SALES as calculated | $ 4,139,360.53 | $ 5,323,561.06 | $ 9,462,921.59 |
| | | | |
| LESS: Gross Sales reported on Form 1065 | $ 3,656,160.00 | $ 4,256,154.00 | $ 7,912,314.00 |
| | | | |
| Unreported Gross Sales on Form 1065 | $    483,200.53 | $ 1,067,407.06 | $ 1,550,607.59 |

---

[1] World Pay is the system that tracks all credit card and EBT transactions at Holyland. Therefore, by using this amount in the months where the government was unable to obtain cash register receipts the government was able to accurately account for credit card and EBT sales.  However, this is a conservative number as it does not account for any cash or check transactions. Thus, Holyland's actual sales were very likely more for this period.

After adjusting Holyland's Form 1065 for the unreported income, the additional income flows through to Defendant's Personal Income tax return Form 1040 at a rate equal to his ownership. Thus, Defendant's income was underreported on his 2012 and 2013 Forms 1040 as follows:

| Mohammad Mohammad | 2012 | 2013 |
|---|---|---|
| 95%[2] owner in 2012 & 50% owner in 2013 | $ 474,050.00 | $ 544,761.00 |
| Less: Mohammad Brothers Partnership Income reported on K-1 | $ 15,009.00 | $ 11,058.00 |
| Unreported Income on Form 1040 for MOHAMMAD MOHAMMAD | $ 459,041.00 | $ 533,703.00 |
| Ownership percentage of Unreported Gross Sales (95% x $483,200.53 & 50% x $1,067,407.06) | $ 459,040.50 | $ 533,703.53 |

After adjusting Holyland's Form 1065 for the unreported income, the additional income flows through to Omar Mohammad's Personal Income tax return Form 1040 at a rate equal to his ownership. Thus, Omar Mohammad's income was underreported on his 2012 and 2013 Forms 1040 as follows:

| Omar Mohammad | 2012 | 2013 |
|---|---|---|
| 5% owner in 2012 & 50% owner in 2013 | $ 24,950.00 | $ 544,761.00 |
| Less: Mohammad Brothers Partnership Income reported on K-1 | $ 790.00 | $ 11,058.00 |
| Unreported Income on Form 1040 for Omar Mohammad | $ 24,160.00 | $ 533,703.00 |
| Ownership percentage of Unreported Gross Sales (5% x $483,200.53 & 50% x $1,067,407.06) | $ 4,160.05 | $ 533,703.53 |

---

[2] Based on the Partnership Tax Return, Defendant was a 95% owner in 2012 and a 50% owner in 2013. Thus, his brother Omar Mohammad was a 5% owner in 2012 and a 50% owner in 2013.

| | | |
|---|---|---|
| | | |

Mohammad Mohammad's failure to report all of Holyland's income on Form 1065 for the tax years 2012 and 2013 resulted in the following additional tax due and owing on Defendant's Form 1040 and Omar Mohammad's Form 1040 for 2012 and 2013:

| Additional Tax Due and Owing for Forms 1040 – Mohammad Mohammad and Omar Mohammad | | | |
|---|---|---|---|
| Names on Forms 1040 | 2012 | 2013 | TOTAL |
| Mohammad H. & Manal Mohammad | $  139,113.00 | $  176,932.00 | $  316,045.00 |
| Omar & Kifah Mohammad | $      5,771.00 | $  176,373.00 | $  182,144.00 |
| | | GRAND TOTAL | $  498,189.00 |

## III.     DEFENDANT'S EXPERT REPORT

Defendant's expert contends that the government's reliance on the register tapes to determine the total sales at Holyland is improper because the "Z" tapes are unreliable and no effort was made to verify the information on the tapes. Defendant's expert is incorrect.

A.  The government verified the accuracy of the register tapes.

Putting aside that the purportedly unreliable register tapes were kept at Defendant's residence and analyzed by Defendant on a regular basis, government agents also interviewed employees at Holyland to determine whether the register tapes were reliable. The government learned that only family members of Defendant were permitted to operate the cash register at Holyland.  Therefore, government agents interviewed family members that worked at Holyland and confirmed that the cash registers were used to accurately record sales.  Specifically, government agents interviewed Defendant's son, Alaa Mohammad, who has been working at

Holyland on and off for ten years and was running Holyland in Defendant and his brother's absence. Alaa Mohammad stated that he primarily works as a cashier and typically the only other cashiers are Defendant and Omar Mohammad.  Alaa Mohammad also stated that when working as a cashier at Holyland, all customer sales are entered into the registers. He also confirmed that he never enters additional items into the register that are not purchased. In addition, he stated that when he is responsible for closing the store at the end of the day he prints an end-of-the-day report from the register which totals the sales for the day.  He then takes that report along with the cash in the register and the credit card receipts and provides it to Defendant. Government agents also interviewed Nader Harb who is Defendant's cousin.  Harb stated that he has worked full-time as a butcher at Holyland since 2015.  He also stated that he occasionally works at the registers to relieve Defendant, Omar, or Alaa for a break.  He further stated when working at the register he rings up all items that are being purchased and only the items being purchased.  Based on these statements, the government confirmed that sales on the cash register tapes should be an accurate representation of the sales at Holyland.

   B.  The void and refund functions were properly operating on the Holyland cash registers.

Despite these statements, Defendant's expert contends that the cash register tapes are not accurate for several reasons. First, Defendant's expert contends that the void function did not operate properly and therefore items that were rung up incorrectly or not sold to customers are included in the sales total.  The Defendant's expert is wrong. The government reviewed the register tapes seized. A review of the tapes show that voids and refunds are reflected on the tapes.  SA Lacy summarized a single month, January 2013, of Z-tapes and found that voids were rung into the cash registers 468 times for a total of $260,371.59.  Additionally, in that same month refunds were rung up 171 times for a total of $12,667.19. These voided transactions were

not included in the daily gross sales amounts the government used in their calculations.  For example, on January 15, 2013 the voided transactions exceeded $70,000 yet the gross sales the government used for that day from that single cash register was only $5,400.50.

     C.  <u>Price inquires were not included in the cash register gross sales amount</u>.

Second, Defendant's expert contends that the cash register was used as an adding machine when customers inquired about the cost of selected groceries and that when the customer did not make the purchase these entries were not voided from the register, therefore overstating the sales. Once again, Defendant's expert is incorrect. As explained above, a review of the register tapes shows that the void function was frequently used. In January 2013 alone, there were 468 voided transactions for a total of $260.371.59.  Additionally, a review of these same tapes report demonstrates that there were 1,859 "no sales" rung up on the cash registers in that same month.  "No sales" are understood to be items rung into the register, yet the sale was never completed.  Thus, non-completed sales did not get added to the gross sales numbers reported on the register tapes.

     D.  <u>Credit sales were not double counted.</u>

Third, Defendant's expert asserts that Holyland allowed customers to make purchases on store credit[3] and that when this happened the practice was to enter the transaction into the cash register at the time of purchase and then again when the customer paid for the purchases on a later date. Defendant's expert claims this resulted in double counting these sales. Again, Defendant's expert is incorrect. The government reviewed the cooperating witnesses' various transactions at Holyland.  One cooperating witness ("CW1") posed as a restaurant owner and

---

[3] The government notes that Holyland's practice of allowing customers, including restaurant owners, to make food stamp purchases on credit is one of the four types of food stamp fraud Defendant and others engaged in at Holyland.

made purchases at Holyland which included "store credit." In several of the transactions, CW1 was provided with a cash register receipt which showed the sales amount for the goods purchased and did not include the additional payment for either "past credit[4]" or "future credit.[5]"

For example, on April 2, 2014, CW1 made a $5.00 food stamp payment towards a past credit[6] which was not entered into the cash register. CW1 received two receipts from Alaa Mohammad. One receipt was an itemized cash register receipt showing a purchase in the amount of $166.33. The second was a World Pay food stamp purchase receipt in the amount of $171.33. However, only $166.33 was recorded in the cash register as this was the amount of money exchanged for the purchase of the goods sold that day. The additional credit amount was not recorded as a sale. This same practice was utilized by Defendant. On July 27, 2014, CW1 made a food stamp payment to Holyland in the amount of $657. However, CW1 only purchased $511 worth of goods. The cash register receipt reflected the only $511 purchase of goods.

This evidence contradicts the defendant's expert's statement that when restaurants that were extended store credit at Holyland ultimately their credit sales were double counted in the cash register. Rather, these examples confirm that Holyland did not double count credit sales. Indeed, as Alaa Mohammad confirmed, Holyland only entered sales into the cash register for the

---

[4] On some occasions when CW1 did not have enough on an EBT card (food stamp card) for his transaction, Holyland permitted CW1 to purchase part of his goods on credit and received payment for the credit in a future transaction.

[5] Holyland fraudulently extended future credit by allowing restaurant owners to use the entire balance of an EBT card despite not purchasing items for the full amount. Holyland then would record the credit amount and allow the restaurant owner to make a future purchase for that amount.

[6] On March 26, 2014, CW1 was $5.00 short on the EBT card he used to complete his transaction. Holyland permitted CW1 to complete his purchase with $5.00 credit. CW1 paid back this $5.00 credit with another EBT card on April 2, 2014. The $5.00 credit payment was not entered into the cash register.

items actually purchased at the time they were purchased, whether it was a purchase by credit or otherwise.

      E.   <u>There is no evidence Holyland engaged in cash back transactions or that it did not properly account for cash back transactions.</u>

Fourth, Defendant's expert asserts that the cash register tapes fail to take into account cash back on credit and debit card transactions. Defendant's expert claims that cash back transactions were improperly entered as sales into the Holyland cash registers, which inflated the sales amount. Defendant's expert offers no evidence besides the self-serving statements of Defendant and allegedly his son Alaa Mohammad that cash back transactions were entered as sales into the cash registers.  Moreover, this practice directly contradicts the statements Alaa Mohammad made to government agents regarding the procedures at Holyland. Alaa Mohammad specifically and unequivocally stated that only purchases were entered into the cash registers. Furthermore, as demonstrated above, Holyland accurately accounted for voided transactions, return transactions, and credit sales.  In addition, a review of the cash register tapes and associated adding machine tape demonstrates that Defendant analyzed every cash register receipt and kept accurate records of his sales. Therefore, it is highly unlikely that Holyland did not also accurately account for alleged cash back transactions.

Furthermore, even assuming Holyland did improperly enter cash back transactions as sales into the cash registers, Defendant's expert fails to provide any actual evidence of the amount of such transactions. Rather, Defendant's expert assumes that every transaction over $50 involved cash back in the amount of $20.  There is no basis for this unfounded assumption. Government cooperating witnesses engaged in over 35 transactions at Holyland that were for amounts in excess of $50.  None of these transactions involved cash back.  In addition, by Defendant's own admissions, restaurant owners frequently make purchases at Holyland as they

are the "one of few stores in Cleveland that offer 100% halal meat."  These restaurant owners

such as CW1 typically spend more than $50 per transaction, but do not obtain cash back.

Additionally, according to Defendant's own expert, "[Holyland] draws customers from all over

northeast Ohio, not just the surrounding area. So that would have an effect on the amount of

sales."  (Case 1:16-CR-52, Sent. Tr. Doc. #90 at 284.)  Specifically, Defendant's expert in a

previous report opined that "[f]or example, it is not uncommon for ethnic Middle Eastern and

North African families to purchase an entire lamb for holiday meals, or even several lambs for

weddings and other large social gatherings."  (Firestone Report, Ex. B.) These customers that

purchase in bulk also would spend more than $50 and there is no evidence that they would obtain

cash back.  Defendant's expert's assumption that every transaction over $50 involved $20 of

cash back is baseless and should be ignored.

Moreover, even if Holyland did improperly enter cash back transactions as sales into the

cash registers, this was Defendant's own doing, as he was in charge at Holyland. Defendant

should not benefit from his alleged improper accounting when he deliberately failed to

accurately report and pay taxes on Holyland's sales. If Defendant would have accurately reported

his gross sales and not engaged in tax fraud, there would be no need to account for alleged

improper cash back transactions.

F.  Defendant's expert's claim that Holyland entered its cash purchases as sales in its
    cash registers is illogical.

Fifth, Defendant's expert argues that certain vendors required Holyland to pay for goods

with cash and that these cash purchases were included in the weekly adding machine tapes, but

not subtracted from daily register tape totals, resulting in an overstatement of sales on the register

tapes.  As an initial matter, Defendant's expert fails to explain why Holyland would enter its

purchases of goods from vendors into its cash register in the first place.  These are not sales

Holyland made. Rather, these are purchases Holyland made from other vendors. The government is perplexed as to why Holyland's expenses would ever be entered as sales in its cash registers. There would be no reason for Holyland to enter its purchases as sales in its cash register. There is also no evidence that Holyland engaged in this wholly illogical practice.

Furthermore, in reviewing the evidence obtained from the search warrants, the government agents did locate boxes which contained invoices from vendors which sold bakery and produce to Holyland.  Some of these invoices did request payment upon delivery.  These vendors included Aladdin's, Global Distribution of Produce, Jasmine Bakery, Sanson, and Super Greenland.  However, a review of the invoices showed that many contained a hand written check number on the invoice.  The government reviewed bank records and found check payments corresponding to these invoice amounts totaling $440,340 in 2012 and $516,043 in 2013.  Thus, there is no evidence that Holyland paid these vendors in cash as Defendant claims. Rather, it appears they were paid by check out of the business bank account. Such expenses were deducted by Jordan in reaching Holyland's expenses.

The government accepted Holyland's expenses, including cost of goods sold, that Defendant reported on the Form 1065 partnership tax return as accurate.  Defendant makes no allegation that the reported expenses were not accurate. Thus, Defendant's expenses, including cost of goods sold, were properly accounted for when calculating the tax due and owing.

G. There is no need to estimate the tax loss based on industry profit percentages because Defendant's expert previously opined that Holyland is a unique business that cannot be compared to other grocery stores and sufficient data is available to determine the actual loss.

In addition to alleging that Holyland's register receipt tapes are unreliable, Defendant's expert argues that the government's analysis of the cash register receipts seized results in net profit percentages which are unreasonably high compared to the industry average. (Expert

13

Report, Ex. A, p. 10).   After relying on Defendant's false statements and the baseless assumptions discussed above, Defendant's expert made adjustments to the sales totals from the cash register tapes for cash back transactions, cash payments to vendors, and the beginning bank[7] amount used by Holyland when it cashes checks.  After making these unsubstantiated adjustments, Defendant's expert concludes that the net profit percentages for 2012 and 2013 were 5% and 7% respectively and that these percentages are in line with the industry percentages. (Id.).  Therefore, Defendant's expert suggests that these percentages should be used to establish a tax due and owing of $77,578.

 This Court should reject Defendant's expert's unsupported estimate of the tax loss.  Not only is Defendant's expert's calculation based on inaccurate information as discussed herein, but the government is also confused as to why Defendant's expert suggests Holyland's profit percentage should be compared to the industry profit percentage.  Defendant's expert argued in a previous case that Holyland cannot be compared to a typical grocery store. Rather, Defendant's expert stated that "[a]cording to [Defendant] approximately 50-60% of [Holyland's] sales for a given month are fresh meat, often purchased in large quantities." (Firestone Report, Ex. B at 3.) Defendant's expert opined this type of purchase does not occur at typical industry grocery stores such as Giant Eagle.  (Id.)  Additionally, Defendant's expert noted that less than 1% of Holyland's sales are non-food items and therefore it is much different than other industry grocery stores such as Giant Eagle, Aldi, and Marcs. (Id.)  Defendant's expert concluded that comparative analysis could not be used to determine the amount of food stamp fraud at Holyland

---

[7] Defendant's expert fails to explain what the beginning bank used by Holyland when it cashes checks has to do with the sales total. There is no allegation that this beginning bank amount is ever entered into the cash register as a sale transaction. Furthermore, there is no reason to believe this amount would be entered as a sale.

because Holyland is unique and other stores are different in size, product, and the clientele they serve. (Id.)  Thus, Defendant argued that the court should use the actual loss rather than estimate the loss amount.

Here, the government has done exactly that. There is no need to estimate the loss amount where Defendant kept accurate records of his gross sales.  The government seized the cash register tapes Defendant maintained at his residence and used Defendant's own records to determine Holyland's gross sales and the amount of tax due and owing.  Thus, the Court should accept the government's loss calculation and find tax loss in the amount of $498,189.

## III.    CONCLUSION

For the foregoing reasons, as well as those to be articulated at the sentencing hearing, the United States respectfully requests that this Court find that the loss amount from Defendant's conduct is $498,189.

Respectfully submitted,

JUSTIN HERDMAN
United States Attorney

By:    /s/ Carmen E. Henderson
Carmen E. Henderson (OH: 0089212)
Megan R. Miller (OH: 0085522)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3967/3855
(216) 522-8355 (facsimile)
Carmen.Henderson@usdoj.gov
Megan.R.Miller@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of November 2019, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/ Carmen E. Henderson
Carmen E. Henderson
Assistant U.S. Attorney