**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,                    CASE NO. 18-CR-735

             Plaintiff,                    JUDGE JOHN ADAMS

    v.                    **DEFENDANT MOHAMMAD**
                                    **MOHAMMAD'S BRIEF REGARDING**
                                    **TAX LOSS AND REPLY TO**
MOHAMMAD H. MOHAMMAD,                    **GOVERNMENT'S RESPONSE TO**
                                    **DEFENDANT'S EXPERT REPORT**

             Defendant.

        Now comes Defendant Mohammad Mohammad, by and through undersigned counsel, and hereby submits his Brief Regarding Tax Loss and Reply to the Government's Response to Mr. Firestone's Expert Report.  Mr. Mohammad submits that the Expert Report submitted by Mr. Firestone sets forth a reliable and reasonable method for determining the tax loss, and that the Government's purported analysis fails to establish a reliable or reasonable tax loss.  An accompanying Memorandum in Support of Defendant's argument is attached hereto and incorporated herein.                    Respectfully submitted,

                                */s/ J. Scott Broome*
                                J. Scott Broome (0042164)
                                J. Scott Broome & Associates Co.
                                1501 Chagrin River Road
                                Gates Mills, Ohio 44040
                                Phone: (440) 448-5142
                                Facsimile: (440) 423-1798
                                sbroome@broomelpa.com

                                */s/Ziad Tayeh*
                                Ziad Tayeh (0088027)
                                Tayeh Law Offices, LLC
                                22255 Center Ridge Road, Suite 311
                                Rocky River, OH 44116
                                Phone: (440) 580-0365
                                Fax: (440) 359-8755
                                Email: info@Tayehlaw.com
                                Attorney for Defendant

### MEMORANDUM IN SUPPORT

**I.   FACTUAL BACKGROUND**

This case is set for sentencing of Mohammad H. Mohammand, on four counts of Filing a False Tax Return under 26 U.S.C. § 7206(1) for the years 2012 and 2013.  The purpose of this Memorandum is to summarize the law and the facts on the issue of tax loss in this case and to reply to the Government's Brief.

**A.  The Food Stamp Case.**

On October 15, 2014, federal agents raided Holy Land Imported Goods ("Holy Land") and the residences of Mr. Mohammad and Omar Mohammad, seizing $10,878 in cash from Holy Land, and more than $50,000 in cash from the home of Mr. Mohammad.  Of the money seized from the home of Mr. Mohammad, $12,700 belonged to Alaa Mohammad, Mr. Mohammad's son, and $22,000 represented the life savings of Huda Mohammad, Mr. Mohammad's elderly mother who resided at the residence.

A few months later, in February 2015, without notice, the Government seized $899,597.86 from Holy Land and other companies owned by Mr. Mohammad, which included operating capital as well as borrowed funds (to purchase the real estate next door), immediately depriving him of his lifetime savings and nearly causing the financial collapse of his businesses.  On February 10, 2016, Mr. Mohammad and his brother, Omar Mohammad, were named in a six-count indictment, which charged them with food stamp fraud, and Mr. Mohammad with three counts of money laundering.

From the outset of the food stamp case, the Government launched a smear campaign against Mr. Mohammad by publicly misrepresenting the extent and nature of his conduct.  For example, on February 11, 2016, one day after the filing of the Indictment, the Government issued a press release, which stated, in part:

> "**The Mohammads and others conspired to commit more than $4 million in food stamp fraud** through the use of their business, Holyland Imported Goods, located at 11717 Lorain Avenue."

2

"**The investigation revealed the defendants and others used their business to exchange customer food stamps for cash** and other unauthorized items. **The defendants also engaged in a pattern of purchasing customer food stamp cards and using them at other grocery locations to purchase inventory for Holyland**…"

"'**The Mohammad's engaged in millions of dollars of fraud** targeting federal government food assistance programs in order to line their pockets,' said Stephen D. Anthony, Special Agent in Charge of the FBI's Cleveland Office. 'Driven by their greed, they showed a complete disregard for those who were truly in need.'"

A media onslaught against Mr. Mohammad and Holy Land ensued. The Government's misrepresentations were covered extensively in local news and re-published in a Cleveland.com article that was shared on social media thousands of times.  Members of Mr. Mohammad's community were shocked to hear that Mr. Mohammad, who had a reputation of honesty and integrity would engage in conduct as salacious as accepting food stamps for cash and purchasing food stamp cards from customers to purchase inventory for their store.

Mr. Mohammad executed a Written Guilty Plea in the food stamp case, pleading guilty to the charges, but stipulating to nothing regarding the amount of the Government's losses as alleged in the Indictment.  Mr. Mohammad and the Government agreed that the loss amount would be determined by the Court at a separate hearing.

The Loss Hearing occurred on January 25, 2018 and January 29, 2018.  The Government presented three "analyses" in attempt to substantiate its food stamp fraud loss: 1) a "comparability analysis" in which the Government purported to compare Holy Land with other stores the Government allegedly deemed "comparable;" 2) a "pre/post search warrant analysis," which the Government attempted compare Holy Land's food stamp redemption percentage for more than eleven years prior to the execution of the search warrant to a twenty-two month period following the execution; and 3)  the "One-Stop analysis" which simply deemed every food stamp transaction involving customers who shopped at One-Stop within 24 hours of shopping at Holy Land as fraud.

3

When subjected to scrutiny, each of the Government's "analyses" proved to be as unsupportable. After years of Government investigation, its "analyses" were exposed as self-serving, illogical, fallacious, and designed to inflict the most damage to Mr. Mohammad rather than determine a reliable loss figure. Instead of seeking a reasonable estimation that is often the government's approach, here the government pursued only the "approaches" that would yield the highest amount.

The Court first rejected the Government's $5.2 million loss figure calculated using the comparability method as "problematic and faulty for many reasons," noting that none of the "comparables" selected by the Government were remotely comparable to Holy Land. For example, the Government absurdly attempted to argue that Holy Land was comparable to Giant Eagle, which, not coincidentally, had a very low food stamp redemption rate, but was not comparable to similar Middle-Eastern grocery stores with similar food stamp redemption rates. Additionally, the Government manipulated Holy Land's food stamp redemption percentage by using erroneous figures, giving the false impression that Holy Land's food stamp sales were higher than they were.

The Court similarly rejected the $2.8 million and $2.6 million[1] loss figures advanced by the Government using the "pre/post search warrant analysis." The Court recognized the flaws in the Government's comparison of asymmetric timeframes, and its failure to consider economic conditions, increases and decreases in food stamp recipients, Holy Land's move into a larger store, or changes in demographics, each of which substantially impacted Holy Land's food stamp redemption rates. Also, this "analysis" yielded disparate results compared to the Government's equally flawed "comparability" analysis.

The Court lastly rejected the $51,000 figure derived from the Government's "One-Stop analysis," reasoning that imputing fraud to every transaction that occurred at Holy Land and One-Stop within 24 hours was "far too speculative" to satisfy the Government's burden of proof.

_____

[1] Each of these figures were calculated by the Government using the same analysis without explanation as to why the same analysis yielded different results.

After the Loss Hearing, the Court properly adopted a loss figure of $10,101.68, which consisted entirely of purchases made by the Government's cooperating witnesses.  Much of the food stamp fraud occurred when Holy Land allowed the cooperating witness to take food from the store and pay the cost of the food with food stamps on a later visit, resulting in no more of a profit to Holy Land than a normal transaction.

Unsurprisingly, the Government failed to present even a scintilla of evidence suggesting that Mr. Mohammad, "used their business to exchange customer food stamps for cash" or "engaged in a pattern of purchasing customer food stamp cards and using them at other grocery locations to purchase inventory for Holyland," as stated in its press release (which the Government never bothered to retract or correct).  The Government's dissemination of at best questionable information is troubling but unfortunately consistent with its fallacious "analyses" and other heavy-handed tactics employed throughout the food stamp case, and as explained below, the instant case.  While the Court in the food stamp case determined the correct amount, it is difficult to see how "just" the government's position was when the actual amount of loss was .19% of the government's position.

Although the Court in the food stamp case determined the loss to be $10,101.68, Mr. Mohammad agreed to a loss figure of $30,004.72 due to the inclusion of the money laundering counts in the plea agreement. Mr. Mohammad further agreed forfeit $419,772.20, nearly *42 times* the amount of the loss from the food stamp transactions.

### B.  The Purported Tax Investigation.

Like the food stamp case, the Government selected an approach designed only to give it the highest alleged loss possible instead of attempting to reach an honest result.  The "method" employed by the Government takes the total amounts reflected on the daily cash register "Z" tapes and then substitutes that amount for the gross income reflected on the Partnership Tax Returns.[2]

---

2  Since Mr. Mohammad's business, Holy Land, filed partnership returns, the tax due is only computed through the individual income tax returns of the partners, the Defendant and his brother.  The Government has not challenged any of the deductions taken on the partnership returns.

Because the numbers reflected on the "Z" tapes yields a larger number than reported on the filed tax returns, the Government alleges that a deficiency, or tax loss, resulted.[3]

### C. Jeffrey Firestone's Report.

Jeffrey Firestone, a licensed Certified Public Accountant, Certified Valuation Analyst, and Certified Fraud Examiner, submitted a report detailing the shortcomings of the Government's use of the daily "Z" tapes as its sole method of attempting to determine tax loss.  Mr. Firestone's Expert Report, together with its attachments, are attached hereto as Ex. A.  Using various metrics and statistics, Mr. Firestone concluded that the Government's tax loss was no more than $118,455.

## II.    LAW AND ARGUMENT

Application Note 1 to USSG §2T1.1, sets the standard to which a court must determine the amount of tax loss under the framework of the sentencing guidelines:

> "In some instances, such as when indirect methods of proof are used, the amount of the tax loss may be uncertain; the guidelines contemplate that the court will simply make a ***reasonable*** estimate based on the available facts." (Emphasis added.)

Later, the same application note reinforces this standard of reasonableness by stating:

> "In determining the tax loss attributable to the offense, the court should use as many methods set forth in subsection (c) and this commentary as are necessary given the circumstances of the particular case. If none of the methods of determining the tax loss set forth fit the circumstances of the particular case, the court should use any method of determining the tax loss that appears appropriate to ***reasonably*** calculate the loss that would have resulted had the offense been successfully completed." (Emphasis added.)

*See eg, United States v. Rankin,* 929 F.3d 399, 409 (6th Cir. 2019).

In this case, the Government's "method" of determining the tax loss yields a patently unreasonable result and, therefore does not comport with the mandate of the Application Notes to USSG § 2T1.1.

---

3  For the 2012 tax year, due to incomplete records, the Government adds the total sales as reflected on the merchant account records (Worldpay) to fill in the gaps where the "Z" tapes are not available.

### A. The Government's Use of the Register Tapes as the Sole Basis for its Analysis is Flawed.

The law is clear that government calculations must be based on reliable data and facts.  "We find nothing in the statutes, the rules of the board or our decisions that gives any support to the idea that the commissioner's determination, shown to be without rational foundation and excessive, will be enforced . . ." *Helvering v. Taylor*, 293 U.S. 507, 514-515 (1934).   "Since the method used by respondent . . . [the government] . . . produces results at variance with the basic facts, it cannot be sustained as one calculated to correctly establish the petitioner's receipts." *Gasper v. Commissioner*, 225 F.2d 284, 285 (6th Cir. 1955).   "We recognize that the absence of adequate tax records does not give the Commissioner carte blanche for imposing Draconian absolutes." *Webb v. Commissioner*, 394 F.2d 366, 373 (6th Cir. 1968)(*citing Gasper*).

The Government's "method" relies solely upon adding up the totals of various "Z" tapes,  that allegedly show the daily totals rung up on the cash registers.  However, since the register tapes do not accurately account for Holy Land's income, it necessarily means that the Government's analysis and alleged tax loss figures are similarly inaccurate.

As an initial matter, the Government failed to analyze the receipts of the individual transactions (like those given to customers after making a purchase) upon which the daily "Z" tape totals are based.  Rather, the Government simply assumed that each of the individual transaction receipts were sales, as this assumption gives the Government its highest totals and therefore its highest loss.  In other words, the Government's entire analysis falls apart if the

The Government argues that Special Agent Ellen Lacy ("SA Lacy") verified that each ring at the cash registers of Holy Land was in fact a sale through employee interviews.  (See Govt. Brief at pages 3, 7-8).  Through these interviews, SA Lacy allegedly, "determined that the cash register receipts should be an accurate representation of sales made in the store on each day." *Id.*, at page 3. (*see also,* [Doc 88, Case No. 16CR 52, page 205).  However, the evidence demonstrates otherwise.

The purported "attempt" that SA Lacy took to verify that the daily "Z" tapes were comprised of sales only were interviews of some of Holy Land employees.  These interviews were purportedly "summarized" in three separate Memoranda of Interview prepared by SA Lacy.   (See, Memoranda of Interviews by Special Agent Lacy of Mr. Solemansha, Mr. Harb, and Mr. Mohammadi, attached hereto as Exhibits B, C and D, respectively (hereinafter, the "Lacy Interviews")[4].

Each of the Lacy Interviews were short in duration.  For example, Nader Harb's interview lasted three minutes.  Each Memoranda prepared after the Lacy Interviews state the same thing – that all sales are rung up on the register and only when customers are purchasing items would anything be rung up on the register, and similar allegations.  However, the Memoranda conflict with other evidence collected during the investigation, and therefore cannot be relied upon.

Special Agent John Breen, FBI, Detective Pat Foye, Lakewood PD and Special Agent Robert Springer, USDA-OIG interviewed Sharifulla Solemanshah, an employee of Holy Land, which was memorialized in a Memorandum prepared by SA Springer.  During this interview, Mr. Solemanshah stated, and SA Springer recorded, "ShariFulla did not work behind the cash register," and "Sharifulla never worked behind the counter and advised that the owners Mr. Mohammad and Omar Mohammad were very secretive with the operation of the business."   (See Interview of Mr. Solemanshah, attached hereto as Exhibit E.)

Similarly, SA Springer and SA Lacy interviewed Mr. Harb, Mr. Mohammad's cousin, prior to the interview "summarized" by SA Lacy in the Lacy Memorandum.  During this interview, Mr. Harb stated that he worked in the meat department and that he only covered the register on rare occasions, for short periods.  (See Interview of Mr. Harb, attached hereto as Ex. F)  At most, Mr. Harb covered the registers for a span of a few minutes a few times per year.

Finally, SA Springer and FBI Special Agent Breen interviewed Najeeb Mohammadi prior to Mr. Mohammadi's interview with Agent Lacy.  The Government did not prepare a Memorandum of

---

4  We note that SA Springer accompanied SA Lacy on these interviews.  Since the same witnesses stated they had

this interview, but did provide an audio recording, which has been transcribed.  (See transcript, attached hereto as Ex. G.)[5]  During this interview, the Agents repeatedly warned Mr. Mohammadi that lying to federal agents is a crime, however, even then, Mr. Mohammadi insisted that hat he never worked behind the counter and never worked the register because he did not know how to operate the register.  Mr. Mohammadi further explained that he simply did his work and did not inquire about matters that were not specific to his job.

Each of these three witnesses have supplied affidavits confirming that the Memoranda prepared by SA Lacy misrepresent the facts.  (See Affidavit of Mr. Solemansha, Mr. Harb, and Mr. Mohammadi, attached hereto as Exhibits H, I and J, respectively.)  As the Supreme Court has recognized in the context of agents' reports and summaries, "distortion can be the product of selectivity as well as the conscious or inadvertent infusion of the recorder's opinions or impressions." *Palermo v. United States*, 360 U.S. 343, 352 (1957); *United States v. Padin*, 787 F.2d 1071, 1077-78 (6th Cir. 1986).

The Government's analysis lacks credibility to sustain the outcome reached through its purported analysis because SA Lacy's conclusions regarding the daily "Z" tapes are based on manipulations and purposeful distortions of the evidence.  As such, the Government cannot prove, even by a preponderance of the evidence, that the "Z" Tapes are accurate, especially considering the absurdity of the results reached through this flawed methodology.

---

little or absolutely nothing to do with the registers when interviewed by SA Springer, SA Lacy's Memoranda are all the more surpising.
5 Mr. Mohammad will provide a copy of the recording to this Court.

**B. The Government's Method Yields a Result that is Objectively Unreasonable Based Upon Independent Sources and Decades of Jurisprudence.**

Focusing on the partnership returns, the Government's purported calculation yields the following result:

| Item | 2012 | 2013 |
|---|---|---|
| Gross Income | $4,139,360.53 | $5,323,561.06 |
| Cost of Goods Sold | ($3,313,742.00) | $(3,870,065.00) |
| Gross Margin | $825,618.53 | $1,453,496.06 |
| Salaries & Wages | 0 | ($150,965) |
| Repairs & Maintenance | (3,602) | ($10,400) |
| Rent | ($54,593) | ($54,000) |
| Taxes & Licenses | ($29,823.00) | ($20,131.00) |
| Interest | 0 | ($30,000) |
| Depreciation | ($12,146.00) | ($ 7,756.00) |
| Other | ($189,893.00) | ($90,772.00) |
| Profit Before Taxes | $535,561.53 | $1,089,522.06 |
| **Percentage Profit Before Taxes** | **13%** | **20%** |

All reliable data indicates that net profit percentages of 13% and 20% are patently unreasonable for a grocery store.  This conclusion is only more certain due to the fact that Holy Land does not sell alcohol (which is generally marked-up no less than 25% for beer and no less than 50% for wine), cigarettes (marked-up no less than 8%), or "energy drinks" (marked-up 45%).

The Government fails to cite to a single study to support its alleged net profit percentage for Holy Land.  Several studies exist that establish the average net profits of grocery stores.  A few of these studies are as follows:

- **Bizstats.com**: This compilation demonstrates that, during 2013, the expected net profit for food and beverage stores was 2.30% of gross sales. (See Bizstats Compilation, attached hereto as Ex.K)  This statistical compilation is cited with approval by the IRS in its Retail Industry Audit Technique Guide. (See Ex. L at page 6 of 158).  Further page 5, the IRS's Retail Audit Technique Guide notes, as a fundamental tenant of the grocery business: "Some retailers earn a small profit on many items and rely on the volume of sales (such as grocery stores), or turnover, to account for their profits." *Id.*

- **CCH Almanac of Business and Industrial Financial Ratios**: This compilation covers July 2013 through June 2013 and demonstrates that the expected net profit of a "Food and Beverage Store" with assets under $500,000, before officer's compensation, is expected to be 3.0%.  (See CCH Compilation, attached hereto as Exhibit M.)

- **Schonfeld & Associates, Inc., IRS Corporate Financial Ratios, 28th Ed.**: This compilation, dated April 2013, evidences that food and beverage stores with sales between $1,000,000 and $24,999,999 averaged an expected net margin of 2.6%.  (See Schonfeld Compilation, attached hereto as Exhibit N.)

- **RMA 2013-2014 Annual Statement Studies Financial Ratio Benchmarks:** These studies, which have long been considered reliable in the industry and are widely cited, demonstrate that supermarkets and other grocery stores (except convenient stores, which Holy Land is not)  yield an expected profit of 2.1% before taxes for stores with sales between $2 million and $10 million dollars.  (See RMA Studies, attached hereto as Ex. O.)

- **Almanac of Business and Industrial Financial Ratios, 2012 Edition**: This compilation states an expected profit before officer's compensation of 2.5% for food and

beverage stores with assets between $500,000 and $1,000,000. Additionally, it demonstrates that, if only stores that reported a profit are considered, the expected net margin for that same segment would be 2.4%. (See attached Almanac of Business Compilation, attached hereto as Ex. P.)

This independent objective data indicates that the net profit from Holy Land should be significantly lower than the impossibly high percentages the Government alleges. As provided in Mr. Firestone's Expert Report, there may be some adjustments for Holy Land because it is a specialty store, which could merit a slight increase. On the other hand, Holy Land is not in an affluent area, and does not sell high profit items such as alcohol, energy drinks, or cigarettes, which likely supports a downward adjustment that offsets any advantage gained by its specialty. This demonstrates that the Government's tax loss figure is unreasonably high and cannot be used by the Court to calculate the tax loss in this case.

Applying even the Government's flawed gross sales figures to the average of the percentages of the various studies cited above, or 2.48%, the tax loss calculation would yield a total tax loss of $44,857.23, shown as follows:

| Years | 2012 | 2013 |
|---|---|---|
| Gross sales Per Government | $4,139,360.53 | $5,323,561.06 |
| Average Net Profit Percentage | 2.48% | 2.48% |
| Expected Net Profit | 102,656.14 | $132,024.31 |
| Reported Net Profit | $52,361 | $22,115 |
| Unreported income | $50,295.14 | $109,909.31 |
| **Approximate Tax Loss @ 28%** | **$14,082.63** | **$30,774.60** |

The fact that grocery stores operate on low margins is neither new nor novel. In addition to the objective data cited above, Courts have also recognized that grocery stores yield low net profits.

For example, the United States Supreme Court recognized the low profit margins of grocery stores, stating, "*On the basis of this not unreasonable belief as to the economics of the highly competitive, low-profit-margin retail-grocery business*, Oklahoma could well have concluded that its choice was to provide that all use a cash discount system or none could do so." *Safeway v. Oklahoma Retail Grocers Ass'n*, 360 U.S. 334, 341, 79 S. Ct. 1196, 1201, 3 L. Ed. 2d 1280, 1285 (1959)(Emphasis added.)

More recently, a court heard testimony and found as fact that grocery store margins are razor thin. In *Argus Leader Media v. USDA*, 224 F. Supp. 3d 827 (US DC SD 2016), 2016 U.S. Dist. LEXIS 164810, 2016 WL 6998623, "Peter Larkin, President and CEO of the National Grocers Association, testified that profit margins in the grocery industry are roughly 1% before tax. He also testified that a 2014 study found profit margins to be \$0.0091 on every dollar." Thus, the court concluded that grocery stores must have a high sales volume to make a profit.[6]

Similarly, another Court held:

> "We need not decide whether, in order to show that a price difference is substantial it must be established that it has some measurable impact on resale prices. For here there is adequate evidence that the price discriminations had such an impact. *There was testimony that those engaged in the resale of such products . . . [groceries] . . . operate on a very narrow margin -- so narrow, in fact, that it is essential to take advantage of two per cent discounts for cash.* The price discriminations, on the other hand, ranged from two per cent to ten per cent." (Emphasis added.)

*Tri-Valley Packing Asso. v. FTC*, 329 F.2d 694, 703 (9th Cir. 1964).

*See also, FTC v. Whole Foods Mkt., Inc.,* 502 F. Supp. 2d 1, 14 (US D.C.C. 2007) (recognizing supermarkets as a "low net margin" industry); *United States v. Swift & Co.*, 189 F. Supp. 885, 895 (US DC ND IL 1960)(selected grocery chains enjoy a net profit of 2.7%); *Continental Baking Co. v.*

---

6 This case also discusses the level of competition and the impact of competition in the grocery business. "Competition in the grocery business is fierce. This conclusion is supported by the testimony of Joey Hays, Andrew Johnstone, Peter Larkin, Gwen Forman, and Bruce Kondracki. Johnstone noted that competition in the grocery business has increased with the entrance of new competitors, and Larkin provided testimony that the profit margins in the grocery industry are at \$0.0091 on every dollar spent. Kondracki also explained competition is not measured solely in terms of lost customers, but in lost dollars to other stores. Kondracki testified the entrance of a new store into an existing market can cause a significant loss in business. Based on this testimony, the court finds that the grocery industry has actual competition." *Id.*,

*Old Homestead Bread Co.*, 476 F.2d 97, 107 (10th Cir. 1973*), citing Beatrice Foods Co.*, FTC Docket 8663 (1969)("Furthermore, profit margins are notoriously low in the retail grocery business."); "*Foremost Dairies, Inc. v. FTC*, 348 F.2d 674, 681 (5th Cir. 1965) ("In the grocery business, *where competition is keen and profit margins are low,* customers may often drive to relatively distant retail outlets if significant price differences or alluring bonuses are made available. This is borne out by the testimony of Conniff that his customers were not restricted to those living in the immediate neighborhood of his store.") (Emphasis added.); *United States v. New York Great Atlantic & Pacific Tea Co.*, 67 F. Supp. 626, 677 (US DC ED IL 1946) ("It is clear from this record that retail distributors of food products in the United States are engaged in a close contest. Profit margins are slight. The difference between profitable operation and loss is fractional in character; between success and failure, astonishingly small.")

Further, the fact that grocery store operate on thin margins is often used *by the Government*, through the Federal Trade Commission, to advance its arguments in cases involving trade and competition. As articulated by the Seventh Circuit: "In its brief, the Commission illuminates some of the evidentiary support for its proposition, Grocers in the Fall Cities [Louisville] market, testified that their business was 'keenly competitive,' that gross and net profit margins are very small, and that consequently they take advantage of cash discounts and any other discounts offered." *Dean Milk Co. v. Federal Trade Com.*, 395 F.2d 696, 713 (7th Cir. 1968), 1968 U.S. App. LEXIS 7497, 50-51 (7th Cir. 1968).

The Government ignores uncontroverted statistical data (some endorsed by IRS), the IRS's own published observation in its Retail Sales Audit Guide, decades of judicial recognition, and logic in arguing that Holy Land maintains absurdly high net profit rates, relying instead on its manipulated evidence and exaggerated characterization of Mr. Mohammad's actions.  Again, the purpose here, as before is to inflict as much damage as possible.  The result reached by the

at 833.

14

Government is unreasonable and, therefore, cannot be the basis for the Court's determination as to the tax loss or restitution in this case.

### C. Mr. Firestone's Expert Report Accurately Sets Forth Reasonable Methodologies of Determining Tax Loss.

The Government makes seven arguments against Mr. Firestone's Expert Report, which Mr. Mohammad will address in turn.

#### 1. *The Government Did Not Verify the Accuracy of the Register Tapes.*

The Government initially argues that it verified the accuracy of the register tapes. However, as demonstrated above, the Government failed to analyze the receipts upon which the daily "Z" tapes were calculated.

Further, the Government asserts in its Brief no less than three times that Alaa Mohammad, Mr. Mohammad's son, stated that only purchases were rang on the register, at one point emphasizing, "Alaa Mohammad *specifically and unequivocally* stated that only purchases were entered into the cash registers." (See Govt. Brief at pages 8, 10, and 11.) (Emphasis added.) However, the Government fails to cite the source of this alleged statement. Worse, a review of the audio recording of the interview demonstrates that Alaa Mohammad never stated that only sales were rung up on the register, and most certainly did not state so "specifically and unequivocally." This unfounded embellishment of evidence is consistent with the Government's approach against Mr. Mohammad over the past several years.

#### 2. *The Void Function Clearly Did Not Operate Properly.*

The Government's recitation regarding the void "function" and what appears to be disclosed by the Z tapes supports the Defendant's position and the expert's findings. It is the Defendant's position that they were having significant difficulties with the void function and, while they would try use it, it was so troublesome that they would often not use it, especially when the store was very busy and there were lines at both registers.

15

The Government's assertion that there were $260,371.59 worth of voids in a single month solidifies Mr. Mohammad's assertion, as this is likely close to the amount of totals sales in the month of January, which defies logic. There are similar discrepancies. For example, on January 15, 2013, the register apparently showed more than $70,000 in voids compared with only $5,400 rung up for the entire day. As such, there were clearly problems with the void function, which undoubtedly creates issues with the daily register tapes that make them unreliable for purposes of computing the Government's tax loss.

3. *Price Inquiries Were Often Included in the Cash Register Gross Sales Amount.*

The Government next argues that the fact that "no sales" were indicated in the receipts demonstrate that Holy Land never rung up "no sales." However, the Government's citing of a single month of "no sales" does not demonstrate that such "no sales' were rung up on the registers each and every time or with any regularity.

4. *Credit Sales Were Often Double Counted.*

The Government cites to a single transaction of a cooperating witness to attempt to refute Mr. Mohammad's contention that the credit sales were not double counted. As an initial matter, credit sales do not impact gross sales, but rather demonstrate that the daily "Z" tapes were inaccurate. Further, the transactions the Government referenced were food stamp transactions, which Holy Land accurately account for to ensure that proper amounts were charged to the food stamp card.

As set forth in Mr. Firestone's report, restaurant customers received credit which were rung on the registers, often multiple times, but made a single payment, which was added into the registers and were double counted on the daily "Z" tapes when they were ultimately paid. This fact, along with the plethora of other evidence outlined in Mr. Firestone's report, demonstrate the unreliability of the register tapes in determining Holy Land's gross sales.

### 5. *Holy Land Often Engaged in Cash Back Transactions.*

The Government next argues that Holy Land did not enter into cash back transactions, and even if it did, it did not account for said cash back transactions in the register tapes. As an initial matter, Holy Land customers have confirmed that they have received cash back on their purchases. (See Statements of Holy Land Customers, attached hereto as Ex.Q.) Therefore, the Government's contention that Holy Land did not provide its customers the option of receiving cash back is false.

The Government relies on Alaa Mohammad's alleged statement that, "only purchases were entered into the cash registers." As discussed above, Alaa Mohammad never made such an assertion. Further, aside from the credibility issues, assuming he did make the statement, Alaa Mohammad's alleged statement that only purchases were rung up does not refute Mr. Mohammad's allegations, as customers received cash back while making purchases. Nowhere does the Government allege that Alaa Mohammad specifically stated that cash backs were not rung into the register.

The Government further alleges that Mr. Mohammad kept accurate cash records. However, given that Holy Land engaged in cash back transactions, the sales records would be inaccurate regardless of whether Mr. Mohammad rang up cash backs, as failing to ring up the cash backs would yield inaccurate cash totals.

The Government next attacks Mr. Firestone's analyses regarding cash back computations. However, the Government only addresses one of these analyses, namely, the method that assumes sales over $50 included cash backs, which resulted in cash back sums of $222,285 for 2012 and $329,285 for 2013. The Government ignores the second method utilized by Mr. Firestone, which imputes the average cash back sum of $33 to the number of cash backs Holy Land likely engaged in based on objective studies of grocery stores. This method resulted in sums of $217,405 for 2012 and $258,909 for 2013 when applied to Holy Land. Mr. Firestone took a conservative approach and

assumed cash back totals to be $210,000 for 2012 and $235,000 for 2013, which is less than each of the methods set forth in his report.

Further, it is of no consequence that the Government's cooperating agents did not receive cash back because (obviously) it is the customer's imperative to request cash back. No cooperating witness requested cash back on a debit transaction. Also, the cooperating witnesses used food stamps, and, despite the Government's public statements to the contrary, there is not a shred of evidence substantiating Holy Land accepted cash for food stamps. Thus, the Government's argument that cooperating witnesses did not receive cash back for food stamps misrepresents the issues of this case.

After dodging arguments and attempting to distract this Court with red herrings, the Government makes the absurd statement that this Court should find Mr. Mohammad is liable for taxes on non-taxable cash backs because, "Defendant should not benefit from his alleged improper accounting." The Government again overreaches, claiming that Mr. Mohammad's sentence and restitution should be based on "improper accounting" rather than the actual loss to the Government. The Government's argument is wholly frivolous and should be rejected.

### 6. The Government Misconstrues the Cash Purchase Issue.

The Government next claims that, it is illogical that, "Holyland would enter its purchase of goods from vendors into its cash register in the first place." The Government is accurate; such a practice would be illogical. However, this is not what Mr. Mohammad is claiming.

Rather, Mr. Firestone details how customers would make cash purchases, which would be included in register totals. Then, Mr. Mohammad would pay various vendors with cash from the register without accounting for the cash purchase in the register tapes. The result of this is an overstatement of cash on the register receipts, as the cash was documented by the register when accepted from a customer but was not accounted for as an expense when paid out to vendors.

The Government is correct that some vendors did provide receipts, however, several did not, and regardless of whether receipts were provided, Mr. Mohammad did not account for the cash purchases he made on his tax returns.  This fact is confirmed by the Government's interaction with Mr. Mohammad's bookkeeper, Abdullah Jordan, who indicating that he only used bank account information to perform his bookkeeping, and therefore could not have expensed cash purchases of inventory.  (See Govt. Brief at pages 4-5.)  As such, cash purchases for store inventory substantially reduces the net profits claimed by the Government and must therefore be taken into account.

### 7.  *The Fact that Holy Land is Unique Has no Bearing on its Net Profit Margins.*

The Government next attempts to utilize its failure in the prior food stamp case to its advantage by arguing that Holy Land is unique, and therefore, cannot be compared to other grocery stores for statistical purposes.  This argument is wholly without merit, as the Court in the food stamp case held that Holy Land was not comparable to normal grocery stores for purposes of determining food stamp redemption rates, not net profits, because Holy Land sold almost all eligible food items. The fact that Holy Land's entire inventory is stocked with items eligible for food stamp redemption has no relevance to its profit margins.

Also, Mr. Firestone recognizes Holy Land's unique nature in his report, noting that Holy Land is a specialty store and therefore, its net income percentage should be higher than the national average of 1.3%.  Mr. Firestone estimates Holy Land's net profit margin to be between 5 - 7% because of its unique nature.  Mr. Firestone further accurately notes that Holy Land does not sell high margin items such as cigarettes, alcohol, or energy drinks, which substantially lowers its margins compared with other grocery stores.  Nor does Holy Land offer other types of high margin non-food items such as greeting cards, batteries, toys, or electronics, which carry a higher profit margin than the groceries that Holy Land carries.

While the Government notes that much of Holy Land's sales consists of meat, it fails to state that groceries such as meat and produce have a low profit margin due to its high rate of spoilage, and

rapid rate of price markdown compared with non-food groceries that have a long shelf life and higher profit margin.

The Government fails to even attempt to offer an alternate explanation to its simplistic adding of inaccurate register receipts. As demonstrated herein and in Mr. Firestone's report, reliable methods and empirical data only serve to harm the Government's position, and the Government's response is to simply sweep them under the rug. Like the food stamp case, the Government choses to double down on its agenda-driven "analysis" instead of attempting to reach a fair conclusion as to the Government's loss. Mr. Mohammad submits that the Government should seek the truth through reliable methods rather than using weak methods to give it the results it seeks.[7]

## III. CONCLUSION

For the foregoing reasons, this Honorable Court should reject the Government's argument and find Mr. Firestone's results are reliable for purposes of computing the Government's tax loss.

Respectfully submitted,

/s/ J. Scott Broome
J. Scott Broome (0042164)
J. Scott Broome & Associates Co.
1501 Chagrin River Road
Gates Mills, Ohio 44040
Phone: (440) 448-5142
Facsimile: (440) 423-1798
sbroome@broomelpa.com
Attorney for Defendant

/s/Ziad Tayeh
Ziad Tayeh (0088027)
Tayeh Law Offices, LLC
22255 Center Ridge Road, Suite 310
Rocky River, OH 44116
Phone: (440) 580-0365
Fax: (440) 359-8755
Email: info@Tayehlaw.com
Attorney for Defendant

---

[7] The Government has many tools and methods of alternative proof at its disposal. None of them were employed here.

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing Brief will be served via the Court's Electronic filing system upon the persons listed therein on this 25th day of November, 2019.

*/s/ J. Scott Broome*
J. Scott Broome (0042164)
J. Scott Broome & Associates Co.
Attorney for Defendant