# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 18CR735 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN ADAMS |
| | ) | |
| v. | ) | **SENTENCING MEMORANDUM** |
| | ) | **OF DEFENDANT** |
| MOHAMMAD H. MOHAMMAD, | ) | |
| | ) | |
| Defendant. | ) | |

This case is set for sentencing of Mohammad H. Mohammad, on four counts of Filing a False Tax Return under 26 U.S.C. § 7206(1).  The purpose of this Memorandum is twofold. First, there are matters relevant to the sentencing of which the Court should be aware which have not been fully dealt with in the Presentence Investigation Report ("PSR").  Second, is to respectfully request that this Court impose a sentence from 6 to 12 months in addition to the sentence Mr. Mohammad is serving on Case No. 16CR52.  Such a sentence is statutorily authorized and would be incrementally sufficient without being greater than necessary to accomplish the goals set forth in 18 U.S.C. 3553(a) after considering the advisory sentencing guidelines and the other unique grounds present in this case.

Nothing in this memorandum is meant as a denial of responsibility by Mr. Mohammad. In fact, Mr. Mohammad has accepted his responsibility by facing the charges, entering his plea, and making substantial restitution.

## LAW AND ARGUMENT

The touchstone of federal sentencing is the legislative mandate that courts must impose "a sentence sufficient, but not greater than necessary, to comply with the purposes" of 18 U.S.C. § 3553(a)(2).  *United States v. Booker*, 543 U.S. 220, 125 S.Ct. at 738 (2005); *United States v. Collington*, 461 F.3d 805, 807 (6th Cir. 2006); *citing, United States v. Foreman*, 436 F.3d 638, 644 n. 1 (6th Cir.2006) (emphasis in original).

The Sixth Circuit has set forth a "procedure" for post-Booker sentencing determinations.  "[O]nce the appropriate advisory Guideline range is calculated, the district court throws this ingredient into the section 3553(a) mix."  *Collington, supra., citing, United States v. McBride*, 434 F.3d 470, 476 (6th Cir.2006).  18 U.S.C. § 3553(a) instructs a district court to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [Section 3553(a)(2)]" which include:

1.      To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

2.      To afford adequate deterrence to criminal conduct;

3.      To protect the public from future crimes of the defendant; and

4.      To provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.

Further, 18 U.S.C. §§ 3553(a)(1), (3)-(7), instruct that the district court should also consider the nature and circumstances of the offense, the characteristics of the defendant, the kinds of sentences available, the sentencing guidelines range, policy statements from the Sentencing Commission, the need to avoid sentencing disparities, and the need to provide

restitution to the victims.

Importantly, a sentencing court may not presume that the Guideline range is reasonable. *Gall v. United States*, 552 U.S 38, 128 S.Ct. 586, (2007); *United States v. Olds*, 309 Fed. Appx. 967, 976 (6th Cir. 2009).

Although the Sentencing Guidelines are advisory, the Supreme Court nevertheless has instructed that the sentencing range recommended thereunder must be "the starting point and initial benchmark" of the district court's sentencing analysis. *Gall v. United States*, 552 U.S 38, 128 S.Ct. 586, 596 (2007); *see also United States v. Bolds,* 511 F.3d 568, 579 (6th Cir. 2007). The Guidelines provide important guidance for district courts in making individualized sentencing determinations because, **"in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives**.'" *Kimbrough*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, at 350 (2007)) (emphasis supplied).

In this case, evaluating the factors set forth in 18 U.S.C. § 3553(a)(2) to arrive at a "sentence sufficient, but not greater than necessary," to comply with the purposes of that section, establishes that a sentence that would leave the Defendant in the position he would have been had he been charged with these offenses in Case No. 16CR52 and therefore imposing a sentence that would add an additional 6 to 12 months to the sentence imposed in 16CR52, will fulfill the statutory mandate.

## I.     The Advisory Guideline Computation

There is no Plea Agreement in this case.  The guideline calculation in PSR uses a tax loss of $498,189 and, since the counts all group, the base offense level state in the PSR is 18

3

before adjustment for acceptance of responsibility.  After reduction for acceptance of responsibility of 3 levels, the Total Adjusted Offense Level set forth in the PSR is level 15. The PSR finds that the Defendant is in Criminal History Category (CHC) II, which recommends a sentencing range of 21 to 27 months. The Defendant objects to this tax loss and guideline computation and, therefore objects to Paragraphs 18, 19, 24, 33 and 61.

The Defendant believes that the loss is between $100,000 and $250,000 as established by the expert report of Jeffrey Firestone, and, accordingly the base Offense level should be level 16.[1]  After reduction for three levels for acceptance of responsibility, the Defendant believes that the Total Adjusted Offense Level should be level 13.  In CHC II, the advisory range is 15-21 months.  However, the Defendant does not believe that CHC II should be used.  In the circumstances of this case, CHC II over represents both the Defendant's Criminal History and the likelihood that he will commit other crimes.  His CHC should be a CHC I.  At a Total Adjusted Offense Level 13, CHC I, the recommended guideline range would be 12-18 months in Zone C.

At a Total Adjusted Offense Level 15, the guideline fine range is $4,000 to $40,000 USSG 5E1.2(c)(3) and 5E1.2(h)(1).  At a Total Adjusted Offense Level 13, the advisory guideline fine range is $3,000 to $30,000. USSG 5E1.2(c)(3) and § 5E1.2(h)(1). (for Offenses committed before November 1, 2015, use the amounts shown in the Guidelines effective November 1, 2014).

**Criminal History Category**

Under USSG § 4A1.3(b), a "downward departure" {or variance] from the computed Criminal History Category may be warranted "[i]f reliable information indicates that the

defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history __or__ the likelihood that the defendant will commit other crimes. . . ." (emphasis supplied) This is just such a case.  This case, which arose out of the same investigation as Case No. 16CR52, represents a major event in the Defendant's life.  The Defendant is 55 years old.  He will turn 56 years old in December. Unquestionably, Defendants who are the Defendant's age and older when they are released have the lowest recidivism rate of all federal offenders.  *See, The Effects of Aging on Recidivism Among Federal Offenders*, United States' Sentencing Commission, December 2017, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf#page=9. Further, Defendants who are the Defendant's age who are charged with financial type offenses are the least likely to commit further offenses.  Generally speaking, the recidivism rate for offenders who are in their late 50's when released ranges from approximately 26.8% for rearrests to 9% for re-incarceration.  *See, Part 5, Table 1 and figure 12; and Part 4, Figure 15.*  It is worth noting that the most common sort of offense that least to re-arrest is an "Other Public Order Offense," of which Mr. Mohammad has no history whatsoever.[2]

Even if the Court were to sentence Mr. Mohammad to no further incarceration, the Sentencing Commissions studies would seem to indicate that the prospect of Mr. Mohammad committing further crimes is very low.  That objective data is backed up by Mr. Mohammad's

---

1 See the accompanying brief on tax loss and Expert report.  There is an argument that the loss could be less.
2 Overall, there is some evidence that longer sentences can have a *negative* impact on recidivism.  In Part 5, Figure 24 of the USSG Study, the lowest rate of recidivism for offenders in the Defendant's age group was for offenders who were sentenced to 12 to 23 months.  Offenders with sentences in the range who were in the same age category as Defendant had a recidivism rate of 24.3%.

characteristics (discussed below) and his admission of guilt, payment of restitution and his desire to correct and learn from his mistakes and end the chapter in his life that the investigation that gave rise to this case and case No. 16CR52.

Accordingly, the Defendant objects to Paragraph 40 of the final PSR.

Further, Mr. Mohammad has already been significantly punished and remains incarcerated from case No. 16CR52.  Not only has he been incarcerated for a length of time shown to produce the lowest recidivism rate, he also forfeited $420,000.  While the tax charges in this case and the charges in 15CR52 may not be legally related to one another, i.e., "relevant conduct," they clearly arise from this one investigation.  Given the unique facts here and the minimal chance that Mr. Mohammad will re-offend, a downward departure from CHC II to CHC I is warranted under USSG § 4A1.3.

Accordingly, Defendant objects to Paragraph 88.  Defendant specifically objects to the generic statement that an upward departure may be warranted "based on the defendant's conduct in this case."  What conduct is that exactly?  Seeking a motion to dismiss the Indictment is not grounds for an upward departure.

Defendant also objects to the statement in Paragraph 37 that "The defendant also laundered money in the amount of $1,893,651.29."  There is no evidence of this nor was there a finding that even remotely approached that statement in Case No. 16CR52.  It is unsubstantiated argument by the government that was not verified by the Probation Department.

II.     The Factors Under 18 U.S.C. § 3553(a).

   **1.** **The Nature and Circumstances of the Offense and History and Characteristics of the Defendant**

   **Nature and Circumstances of the Offense**

At its most basic form, this case is a simple "skim" case, where a business owner "skimmed" some of the funds generated by his business. The issue of how much is in serious question.

As expanded on below and in the Defendant's brief with regard to loss, the Defendant owned and operated a grocery store called Holy Land that specialized in middle eastern food that meets the tenets of Halal or food permitted by Islam. In keeping with Halal, Holy Land only sold food, no alcohol, cigarettes or energy drinks. It also sold to restaurants "on account" and to some individuals in that fashion. These "on account" transactions were recorded in such a way that, while convenient for Mr. Mohammad to keep track of, artificially increased the store's sales as recorded on the cash register tape. In addition, the store also allowed customers to obtain "cash-back" on debit and credit cards but did not have a system capable of tracking these transactions as anything other than sales. Also, the store engaged in check cashing services for customers. While all of the checks that were cashed were deposited into the store's bank account, each year, the initial cashing activity was funded by Mr. Mohammad. Finally, some vendors who sold merchandise to the store required that they be paid in cash. This was especially true for produce vendors and some smaller vendors, as the goods they sold were highly perishable. For many of these types of items Mr. Mohammad would keep track of in handwritten books or in notes as

there was no computer aided system to track all of this during these years.

At the end of the year, Mr. Mohammad would simply give the bank statements to the accountant who prepared the return, using deposits and expenses paid by check to prepare the return. Cash generated by the business that was not deposited, was used to cash checks, provide cash back or spent on vendors and was therefore income not subject to an offsetting deduction, did not get accounted for. However, the corresponding deductions or reductions in sales were not accounted for either. At the end of the day Mr. Mohammad benefitted has admitted his guilt.

There is nothing about the nature and circumstances of the offense that warrants a sentence above the applicable guideline range, nor a sentence above the guideline range that would have applied if Mr. Mohammad was charged with the tax offenses here in Case No. 16CR52 and subject to a Guidelines determined incrementally greater punishment.

**Characteristics of the Defendant**

Mohammad H. Mohammad is 55 years old and is a foreign born and educated naturalized United States citizen. Prior to the investigation that has produced this case and case No. 16CR52, he has had minimal interaction with the criminal justice system. He stands before the Court at what he hopes will be the beginning of the end of what has been a five-year battle with the government over his business and his savings. Arguably, the government's case against him was aggressive. What was supposedly millions of dollars of fraud turned out to be $10,000. He has now twice admitted his guilt. He has forfeited a substantial amount of money and he has been incarcerated. He has made significant restitution in this case. The costs of this on Mr. Mohammad have been huge financially, physically, emotionally, costs that run from him to his family. This has been all-consuming. In all of this, he has learned his lesson. He wants it to

8

end. He wants the chance to show that he has learned from this and that he can be both the generous religious immigrant as well as the careful businessman who can and will operate his business completely within the bounds of the law.   He knows that he will be punished for his conduct.  He stands before this Court asking that the punishment be such that it allows him to demonstrate what he has learned without separating him from the means for him to prove it for so long that loses everything.

Mr. Mohammad was born in Al Bireh, Palestine, a village located a few miles north of Jerusalem, in December of 1963.  He lived through the 1967 war and spent his childhood and adolescent years living in Al Bireh under military occupation with his parents and siblings in a humble two-bedroom apartment.

Mr. Mohammad emigrated to the United States in 1983, and his brother, Omar, followed in 1986.  Mr. Mohammad came seeking freedom and a better life for their loved ones, far away from the struggles of living under military occupation. Mr. Mohammad attained US citizenship in 1988. Mr. Mohammad obtained his education in Palestine, through high school, and took some classes here at Cuyahoga Community College.

Mr. Mohammad was married in 1988 to Manal. They have two sons and a daughter, all of whom are college educated.

The Mohammad family is very close and, in addition to raising his children, Mr. Mohammad has always provided for his mother, Huda Mohammad who is 80 years old and lives with Mr. Mohammad at his home and is dependent upon he and his wife and her grandchildren. Hasan Mohammad, the Defendant's father, suffered a debilitating stroke in 1999, leaving him permanently disabled and requiring constant care and attention. Mohammad Mohammad brought

9

his father into his home, refusing to house him in a nursing facility. In 2007, both of Hasan Mohammad's legs were amputated, and despite this, Mohammad Mohammad kept his father in his home surrounded by his loved ones until he died in 2011.

Mr. Mohammad is deeply religious, and, before his incarceration, he attended the Islamic Center of Cleveland daily for morning congregational prayers, which occur at dawn, usually an hour before sunrise, and evening congregational prayers, which occur after the sun has completely set and no outside light remains. He also attended weekly congregational prayers on Friday afternoon. Mr. Mohammad strictly observes the tenets of his religion and fasts during the Islamic month of Ramadan and offer alms in accordance with Muslim tradition. In keeping with his faith, he does not consume alcohol or illegal or other recreational drugs.  Mr. Mohammad is also very involved in his Mosque and he does his best to support both the Mosque and the community in general.

Mr. Mohammad has always been the sole breadwinner of his family (although his sons are taking a far more active role in the business as Mr. Mohammad is incarcerated).  In order to provide a living for his family, Mr. Mohammad started Holy Land Imported Goods in 1995. Initially, the store was at a different location than today and the business moved to its current location in 2008.  Holy Land is the largest middle eastern grocer in the State of Ohio and is a landmark for Muslim families in the Northeast Ohio area.

The store is operated in keeping with Mr. Mohammad's religious beliefs.  Holy Land does not sell any alcohol, cigarettes, energy drinks or soda, nor does it sell lottery tickets.  It is a food market that sells fresh meat, produce and imported drygoods – all of which are "halal," either by content or manner of preparation.  In addition to food, Holy Land carries some food

10

preparation utensils, a small selection of middle eastern dining ware and incense.  The store is clean and well kept, but decidedly not fancy.  It has a small, narrow parking lot with seven spaces outside the entrance and has approximately 9400 square feet of retail space.  It has merchandise on large shelves that run perpendicular to a walk-up counter that has two checkout stations on it.[3]  The meat department and meat counter also runs perpendicular to the walk up counter with the registers, but is set back in a recess such that one cannot be seen by the other.

Mr. Mohammad's true calling has been in his charitable nature and his good works throughout the Cleveland area and beyond.  The attached letters show clearly a remarkably humble man who is kind and generous to all in need.  Mr. Mohammad's sense of self-worth does not come from large houses, fancy cars, elaborate vacations or a high lifestyle. His happiness and self-worth is derived by helping people.  (Letter of Nihaya Atchanah, Ex. Q).  These letters give an accurate picture of a man who is a beneficial presence in the community.  Unquestionably, when people are hungry, Mr. Mohammad will ensure that they are fed.  If they are in need of a place to live, shelter from a storm, he provides it.  (Letter of Enas Fuqaha, Ex. L)  He asks nothing in return, preferring his contributions to be "silent and humble."  (Letter of Ayham Abazid, Ex. A)  Uniformly, he is described as "generous, humble, responsible, kind, hardworking, respectable, selfless, giving, caring, thoughtful, sincere, uplifting, positive."  These accolades did not come through the giving of large sums to prestigious organizations which gifts are celebrated by naming rights or a large black-tie gala, they were accumulated over years of helping the poor, the needed and the forgotten – true acts of charity.  As he is in the grocery business, much of this charity comes from ensuring that people have food to eat "he made sure I

---

3  Holy Land invested in much more modern and capable "touch screen" cash register systems in late 2017 in an attempt to upgrade the recordkeeping at the business.

felt welcome to come in anytime and take what we need for the kids." (Letter of Saeda Hammad, Ex. M).  However, his charity is so much more than just that, it is his home and time (letter of Enas Fuqaha, Ex L) and the way he goes about it, "ensur[ing] the dignity of the often needy and poor recipients is not compromised."(Letter of Ayham Abazid, Ex. A).  Through Holy Land frequently gives away free food to refugees and homeless veterans seeking help and is well known as a place where no hungry person gets turned away. Holy Land participates in a program run by parishioners at the Mosque to provide food to people who are in need.  Mr. Mohammad and his brother, Omar, have dedicated themselves not just to the success of Holy Land, but tp the greater good of their community. Mr. Mohammad lives in a modest home in Parma (as does his brother[4]).  Mr. Mohammad's lifestyle is spartan, he does not drive flashy cars, wear flashy clothes or take lavish vacations.

It is worth noting that Mr. Mohammad's charitable works all pre-date any investigation or prosecution.  They reflect the true character of the man.

Mr. Mohammad is an asset to the community.  We would be blessed to have many more people like him in the community.

**Holy Land**

Operating Holy Land has not been easy.  While the area around Holy Land is home to a growing population of refugees and immigrants from the middle east, with recent influxes of people from Syria, Palestine, Afghanistan and Iraq, there has been, at times, intense competition in the grocery business for those customers.  Before moving to the current location, Holy Land struggled as competition was fierce and price wars were common.  Even when it moved in 2008,

---

4  Omar's house is in Mohammad's name and the mortgage is as well only because of Mr. Mohammad being the older brother and he ensures that the payments are made.

there were three competing grocery markets within a quarter of a mile and Holy Land had a few impediments to overcome.  First, it is located on busy West 117th Street (the building also fronts on Lorain Ave., but the entrance is on W. 117th) which is often a difficult place to park for on-street parking and, second it had only seven (7) parking spaces in a narrow lot that is easy to get in, but difficult to get out once you are in. This really limited the flow of customers.   Price competition was fierce and it was hard for people to park.  Fortunately, in 2013, the building next door, which had 38 parking spaces, became available.  Mr. Mohammad bought it using a loan from a bank as well as a loan from his uncle.  He did not need or want the building, it was the parking that was key.  Fortunately, in March of 2014, he was able to sell the building to a dental office and was able to work out an arrangement that still gave Holy Land customers access to the parking lot.  This was a significant development for Holy Land.  Clearly, this gave Holy land an advantage because, by the end of 2013, two of the three other markets near Holy Land closed.

**Mr. Mohammad Today**

As the Court is aware, Mr. Mohammad has been incarcerated in the NEOCC since January as part of his sentence in 16CR52.  Although the total amount of prohibited food stamp transactions in that case was approximately $10,000, Mr. Mohammad forfeited $420,000, a significant financial penalty the effects of which are ongoing.  Further, Mr. Mohammad (and Holy Land) got kicked out of six banks, which led to mad scrambles to find a way to bank for the store and, eventually, lead to Mr. Mohammad suffering heart failure in December of 2015.  This is a big issue for Holy Land.  The store receives deposits from its merchant account daily, funds that it must receive to operate.  It also writes as many as ten checks a day to vendors.  The loss of the ability to bank is devastating to a business like Holy Land.  In addition, Holy Land has

13

suffered collateral consequences from Mr. Mohammad's and his brother's convictions in 18CR52 – Holy Land may no longer accept food stamps – a fact that has had a material adverse effect on sales for 2019. Previously, on average, Holy Land's sales to food stamp customers amounted to approximately 25% of its overall sales – a significant impact.

Mr. Mohammad has begun to effect change at the store. He has had installed a much more advanced, computerized system that has the ability to track many of the things Mr. Mohammad would write down on paper while using the cash registers like an adding machine. He is moving away from the "old world" methods and attitudes and towards a system that makes compliance easier rather than harder. He is accepting input from his sons who were born, raised and educated here, about how he should keep track of the business. He has hired a new, more experienced and skilled Certified Public Accountant to help him file accurate returns and learn how to ensure accurate reporting to the CPA.

Mr. Mohammad is not the same person he was even one year ago. He realizes that he has not always conducted himself within the bounds of the law, and has also operated his business, which is pretty large by sales volume, in a more casual manner than is appropriate for a business of its size. He wants to end this chapter in his life and take the lessons he has learned and move his life forward. It has been five years since his home and business were raided. He is raising the proverbial white flag. He misses his family, his store, his customers and his mosque. While he is aware that the tax offenses are separate, his experience over the last few months has only reinforced what he was beginning to understand. This has been a long process and he has learned from it. These post-sentence rehabilitation (from case No. 16-52) and presentence in this case are permissible grounds for a variance. *See, United States v. Carruthers*, 28 Fed. Appx.

14

405, 2002 U.S. App. LEXIS 894 (6th Cir. 2002), *citing United States v. Rudolph,* 190 F.3d 720 (6th Cir. 1999).[5]  They certainly support a sentence of 6-12 months additional time over the sentence in 16CR52. Considering these very important factors, it is apparent that a sentence below the advisory guideline range in this case, would be sufficient, but not greater than necessary to accomplish the goals of sentencing under 18 U.S.C. § 3553(a)(1).

      2.      **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment**.

Tax crimes are serious offenses.  However, they are nonviolent offenses.  The particular offenses in issue in this case do not require a period of incarceration as they are Class E felonies.  See, 18 U.S.C. §§ 3559(a)(5) and 3561(a).  Accordingly, the range of authorized punishment that is available to the Court is very broad.  The options available in the range of authorized punishment could be tailored to recognize the nature of this case which is a continuation of Mr. Mohammad's of the same investigation that resulting in his current incarceration.  The punishments from case No. 16CR52 are relevant to this issue given the circumstances present here.  The combination of them should be considered.

To account for the seriousness of this offense, the incremental approach of the Guidelines reflected in USSG § 3D1.1, et seq. is instructive.   Mr. Mohammad is already incarcerated for offenses that were simultaneously investigated along with the offenses in this case.  Certainly, that sentence is having the effect of promoting respect for the law on Mr. Mohammad individually.  Further, a sentence that results in Mr. Mohammad being sentenced to 24-30 months *overall*, between this case and 16CR52, which is the guideline range that would have applied to Mr. Mohammad had these charges had been brought in case No. 16CR52,

---

5  Defendant notes that USSG §  5K2.19, enacted in 2000, had prohibited this as a basis for departures/variances.

reflect the seriousness of the offense and would promote respect for the law *according to the Guideline Commission*, by imposing a sentence that is incrementally greater than the sentence called for in case No. 16CR52, i.e., sufficient, but not greater than necessary, to accomplish the goals of Section 3553a.

> **3.** **The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct.**

> **A.** **Specific Deterrence**

The facts of this case run contrary to the notion that Mr. Mohammad poses any risk of recidivism.  He has no previous record of any kind. He is industrious and has never made his living by illegal means.  He is 55 years old which is a large factor in assessing the chance of recidivism.  The investigation that lead to this case is the same investigation that lead to his current incarceration – were all part of the same investigation.  Mr. Mohammad has already faced the public embarrassment, shame and humiliation of having his crime widely reported in the community in which he works and lives.   A man with no prior record will now carry the black mark of a felony conviction for the rest of his life.

Specific deterrence has already been accomplished.  After consideration of Mr. Mohammad's crime free life, his good qualities and the negative collateral consequences he has suffered, a sentence below the guideline range is clearly sufficient but not greater than necessary to achieve specific deterrence.

---

However, 5K2.19 was deleted, effective November 1, 2012.

**B.      General Deterrence**

The government has already achieved its goal of general deterrence.  It has publicized the charges widely.  And, while general deterrence is one of the most relevant goals in any case, it is still subject to the legislative command that a sentence must be *sufficient, but not greater than* necessary, to accomplish the goals of sentencing.  An unjust sentence is still unjust, even if it is effective at promoting general deterrence.

The Defendant submits that, given that the investigation that lead to both his current incarceration and the charges in this case constitutes Mr. Mohammad's first time being incarcerated and ended up being two cases because of procedural niceties that are not clearly understandable to the layman, that general deterrence will be sufficiently accomplished by imposing the same overall sentence that would have resulted had Mr. Mohammad been charged with the tax offenses in case No. 16CR52, 24-30 months, so an additional 6 to 12 months in this case.  But for the fact that he was charged separately, that sentence would have been deemed by the Sentencing Guidelines Commission to have been sufficient, but not greater than necessary to accomplish the goal the general deterrence.  There is simply no reason why that result should be changed in this instance.

**4.      The Kinds of Sentences Available.**

The sentences available to this Court range are as follows:

1)      Probation: 0 to 5 years 18 U.S.C. § 3561(a) and (c)(1).
2)      Probation for the above stated terms coupled with a period of home confinement with or without electronic monitoring. 18 U.S.C. § 3563(b)(19)
3)      Probation for the term in paragraph 1, coupled with a period of community confinement at a facility such as Oriana House or working in community services. 18 U.S.C. §§ 3563(b)(11) and (12).

4)      Probation for the terms in paragraph 1, coupled with intermittent confinement with the Bureau of Prisons totaling no more than one year, during the first year of probation.  18 U.S.C. § 3563(b)(10).

5)      A sentence of imprisonment followed by a period of supervised release not to exceed three years.  18 U.S.C. § 3583(b)(2).

Each of these available sentences include the ability to impose a fine 18 U.S.C. § 3571(b).

In summary, an analysis of the factors under 18 U.S.C. § 3553, clearly demonstrate that a sentence of 24-30 months overall with the 18-month sentence in case No. 16CR52, is authorized and would be sufficient, but not greater than necessary.

**III.      The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**.

An offender charged in one indictment with the exact same offenses that Mr. Mohammad has plead guilty to here and in case No. 16CR52 would face an advisory guideline range of 24-30 for all of the offenses under the grouping rules of the Guidelines.  That fact, considered with the nature and circumstances of the offense, Mr. Mohammad's personal characteristics and the amount of restitution, would not result in an unwarranted disparity when comparing Mr. Mohammad's situation to other defendants who have engaged in similar conduct.

**IV.      The Need to Provide Restitution to any Victims of the Offense**.

Mr. Mohammad has paid $125,000 towards restitution prior to sentencing.

Courts have held that, in the face of a conviction for an offense under Title 26, absent an agreement, a court cannot issue a restitution order or judgment as part of its sentence, but may only make the payment of restitution a special condition of probation or supervised release,

whichever is applicable.  *United States v. Butler*, 297 F.3d 505 (6th Cir. 2002); *United States v. Lawrence*, 2014 U.S. App Lexis (6th Cir.); reading, 18 U.S.C. § 3563(b)(2) (probation) and 18 U.S.C. § 3583(d) (supervised release). Accordingly, a court does not have to issue an order of restitution if it does not feel it necessary, even as a condition of supervision.  This is consistent with the precatory language of 18 U.S.C. § 3663(a)(1)(A) – may.

Given the facts of the case and the amount and nature of the restitution that has already been paid, not only is a restitution order improper, it is unnecessary.  However, the payment of restitution can and should factor into determining the over- all sentencing determination in in this case.

The Supreme Court, citing a 2018 publication by the Government Accounting Office, recently noted that approximately 90% of restitution orders in criminal cases are uncollectible. *See Lagos v. United States*, 138 S. Ct. 1684, 1689 (2018). Cases in which a Defendant makes substantial restitution have been found to be so unusual as to warrant a downward departure on the basis that in so doing they exhibit and extraordinary level of acceptance of responsibility. *See eg., United States v. Davis*, 797 F.Supp 672, 676 (DC ND IN 1992), where the court stated:

> "The court finds that such a large amount of prepaid restitution is a circumstance which is highly unusual, and is present in this case to a degree substantially in excess of that which is ordinarily involved in sentencing considerations for similar convictions.  Although the defendant's restitution was not paid in full prior to the issuance of the indictment, the court finds that his extraordinary amount of restitution does constitute "super acceptance of responsibility" which warrants departure.  In light of the unusual circumstances of the prepayment of such a large restitution amount, the court finds that the guideline level attached to that factor is inadequate.  Thus the court will depart from the guideline range to impose a reasonable sentence.
>
> Normally, in property offenses such as mail fraud, the guidelines dictate level increases for the amount of loss, regardless of how much value is returned to the victim.  However, in this case, the court finds that based upon the highly

unusual $800,000 restitution, a logical and reasonable basis for the extent of the departure from the guidelines is to eliminate the level increase which would have been assessed for the estimated loss range of between $500,000 and $800,000. The guidelines specific offense characteristic criteria indicate the base offense level should be increased by "eight" levels due to this agreed estimate of the amount of loss."  U.S.S.G. § 2F1.1(b)(1)(I).  Therefore, the court will depart from the recommended guidelines sentence level by decreasing that level by the "eight" levels assessed for the amount of loss."

Here, Mr. Mohammad's payment of the restitution supports the least severe sentence applicable.  Certainly, this fact is strong evidence against a sentence that reflects any sort of upward departure.

**V.  The Unique Posture of this Case Warrants a Sentence of 6-12 months Consecutive to Mr. Mohammad's Sentence in 16CR52 in Order to Avoid Unwarranted Sentencing Disparities and to Impose a Sentence that is Sufficient, but not Greater than Necessary to Accomplish the Goals of 18 U.S.C. § 3553(a).**

A sentencing Court may combine factors when considering whether to and the degree to which to vary and the sentence to impose.  *See eg., United States v. Tomko,* 562 F.3d 558 (3rd Cir. 2009).  In *Tomko*, the Court imposed a probationary sentence in a tax case when the defendant in that case had a total adjusted offense level of 13, as does Mr. Mohamamd in this case.  The Court in *Tomko* relied upon a variety of factors, significantly, charitable good works, which are present here to a much, much larger degree than in *Tomko,* in order to support what amounted to a two level departure and impose a sentence of probation with a condition of home confinement.

The unique posture of the case is the first factor that warrants examination.  What would the Defendant's sentence have been if the Government had ***charged*** these offenses in case No. 16CR52?  This is an important question given that Mr. Mohammad was charged in this case less than a month after he was sentenced in 16CR52. Clearly, the offenses were known to the

20

Government.  The two cases stem from the same investigation.  The tax loss was raised and withdrawn in 16CR52.[6]  In the posture that this case is in, the result that would have obtained if Mr. Mohammad was charged in that case would unquestionably be relevant to the Court in determining a sentence that is sufficient, but not greater than necessary in this case, especially since the sequential prosecutions increases Mr. Mohammad's Criminal History Category, arguably artificially.

Had Mr. Mohammad been charged with the tax offenses in 16CR52, the rules for addressing multiple counts set forth in Part 3 of the Sentencing Guidelines would have come into play.  Those rules provide that, where "defendant has been convicted of more than one count, the court shall: Group the counts . . . into distinct Groups of Closely Related Counts ("Groups") by applying the rules specified in § 3D1.2a.  USSG § #D1.1(a)(1).

In this instance, if the Defendant had been charged with and plead guilty to the tax offenses charged in this case in Case No. 16CR52 in addition to the offenses to which he plead guilty in that case, the counts would not have grouped as tax counts do not group with fraud counts.  *See, Weinberger v. United States,* 268 F.3d 346 (6th Cir. 2011); *United States v. Vucko*, 473 F.3d 773 (7th Cir. 2007); *United States v. Smith,* 424 F.3d 992 (9th Cir. 2005); *United States v. Martin*, 363 F.3d 25 (1st Cir. 2004); *United States v. Shevi,* 345 F.3d 675 (8th Cir. 2003).[7]

---

6  While there was an argument about the tax loss being relevant conduct to the guilty pleas in 16CR52, it clearly was not.  Any tax loss, was not connected to the foods stamp activity as all food stamp revenue was deposited into the bank and, therefore, reported on the return.

7  While there are cases in the Second Circuit to the contrary, *United States v. Petrillo*, 237 F.3d 119 (2d Cir. 2000), and *United States v. Fitzgerald*, 232 F.3d 315 (2d Cir. 2000), those cases are distinguishable as those cases held that that tax and fraud offenses that are part of a common criminal scheme should be grouped, which is not the case here All of the food stamp proceeds were deposited in the bank and reported so they did not make up the false statements.  Also, the Second Circuit has been inconsistent in its opinion on this issue., *See, United States v. Caba*, 911 F.Supp. 630, 642 (ED NY 1996), *aff'd, United States v. Caba*, 1996 U.S. App. LEXIS 30971 (2nd Cir. 11-29-96*)* (fn. 11 – "If Caba had been charged with both unlawful acquisition of food stamps and tax evasion, but not money laundering, the resulting offense level, 19, would have been the same. ***The food stamp count and the tax evasion count would***

21

Accordingly, under USSG § 3D1.1(a)(1), there would be two groups, the fraud group and the tax group.

Next, USSG § 3D1.1(a)(2), instructs that the applicable offense level for each group should be determined in accordance with rules specified in § 3D1.3. In case No. 16CR52, the Court found the applicable guideline computation for Mr. Mohammad for the food stamp fraud and the money laundering counts, which grouped, to be level 15 after all adjustments. Even using the Government's tax loss number, the guideline level for the tax counts would be 18, less three for acceptance of responsibility for a total offense level of 15. Using the Defendant's loss number, the tax group would be a level 13.[8]

Next USSG § 3D1.1(d) instructs that the combined offense level is determined by applying the rules in § 3D1.4. The guidelines computation would be the same no matter which tax loss number was used, as USSG 3D1.4(a) assigns one point to the first group and then one point to the next group with an offense level equal to or up to four levels lower than the highest group. Accordingly, applying the chart in § 3D1.4, two levels would be added to the level 15, resulting in a Total Adjusted Offense Level of 17.

Thus, had the government charged Mr. Mohammad in Case No. 16CR52 with the tax offenses charged here, his Total Adjusted Offense Level in 16CR52 would have been 17 at Criminal History Category I, which would have recommended a sentence of 24-30 months. While one cannot be certain what the Court in 16CR52 would have done, the Court imposed a low-end sentence due to the mitigating factors present and a low-end sentence would have

---

*not have been grouped* since none of the four grouping rules at U.S.S.G. § 3D1.2 would be applicable, and under the unit system of U.S.S.G. § 3D1.4, two levels would be added to the count with the highest offense level, 17, to produce a combined adjusted offense level of 19")(foot note in DC opinion) (emphasis supplied).

8  The guidelines computation would be the same no matter which loss number was used, as USSG 3D1.4(a) assigns

yielded an additional six (6) months on top of the eighteen (18) month sentence imposed. A high-end sentence would have imposed an additional 12 months.  Clearly, given Mr. Mohamad's charity in the community, a low end sentence is warranted.

The whole purpose of the grouping rules is to incrementally increase punishment in multiple count cases to produce a punishment that the United States Sentencing Commission determined to be sufficient, but not greater than necessary to accomplish the goals of sentencing under § 3553(a).   Giving the Guidelines the appropriate deference in determining a sentence that might achieve § 3553(a)'s objectives, *Kimbrough*, 552 U.S. 85 at 109, it is clear that the result that a sentence that is consistent with the approach of incremental punishment that would have been recommended if all of the charges had been filed together is s*ufficient, but not greater than necessary,* to accomplish the goals of sentencing under 18 U.S.C. § 3553(a).  Given the deference accorded the Sentencing Commission and the mandate by the legislature to impose a sentence that is sufficient, but not greater than necessary, a sentence in this case that results in an overall sentence of 24-30 months in addition to the sentence imposed in 16CR52, or 6-12 months additional time would be appropriate in this case.

## VI.    Mr. Mohammad's Extensive Charitable Good Works Merit A Variance or Departure in This Case.

Courts have varied/departed in cases where a defendant has a record of charitable good works.

*See eg., United States v. Tomko*, 562 F.3d 558 (3rd Cir. 2009); *United States v. Rioux*, 97 F.3d 648, 654 (2nd Cir. 1996) ("The court also heard of Rioux's "good acts," specifically his: (1) hiring of an impoverished Hispanic woman as a Special Deputy; (2) personal loan to an immigrant who wished to purchase a home owned by Rioux; (3) contributions to charities; and (4) leadership in fundraising efforts."), citied by *United States v. Coleman*, 188 F.3d 354 (6th Cir. 1999).

one point to any offense equal or up to four levels lower than the highest group.

> The Court believes that based on the facts of the case, including this Court's findings at the first sentencing regarding the defendant's "community involvement and exemplary personal record of achievements in the community," See Kuhn, 345 F.3d at 435, a downward departure from the now advisory Sentencing Guidelines is warranted. The defendant's involvement in his community extends well beyond mere financial contributions. Rather his community involvement includes thirty years as a Eucharistic and homebound minister, lector and parish council member at Holy Trinity church; service on the board of directors of the Bay Arts Council; president of Bay Fresh Start program, which is a local alternative to probation; volunteer worker for Habitat for Humanity and the Paint & Pride program; sponsor for the Delta College public television auction for over ten years; member of the Bay City All Saints School Board; volunteer athletic coach at the local YMCA; and volunteer at Bay City Creative Caring preparing meals for the day care center. He also has assisted residents of the Arete Center, a community corrections facility, obtain employment.

*United States v. Kuhn*, 351 F. Supp. 2d 696, 705 (US DC ED MI 2005)(granting 4 level downward variance).

In this case, as the letters clearly show and as discussed above, Mr. Mohammad's charity and his kindness to his fellow man are exemplary in both their nature and their prevalence. Clearly they are present to an extraordinary degree and merit a downward variance in his sentence.**CONCLUSION**

Considering the factors set forth in 18 U.S.C. § 3553, and/or the grounds for departure, it is respectfully submitted that a sentence of 6 months additional time to the 18 month sentence imposed in Case No. 16CR52, would reflect the seriousness of the offense, provide just punishment and adequately meet the goals of deterrence, retribution and rehabilitation.   Such a sentence would also be sufficient, but not greater than necessary to comply with the purposes set forth 18 U.S.C. § 3553 and satisfy the Court's obligation to consider the advisory guidelines.

Respectfully submitted,

*/s/ J. Scott Broome*
J. Scott Broome (0042164)
J. SCOTT BROOME & ASSOCIATES CO.
1501 Chagrin River Road
Gates Mills, Ohio 44040
Phone: (440) 448-5142
Facsimile: (440) 423-1798
sbroome@broomelpa.com
ATTORNEYS FOR DEFENDANT

**CERTIFICATE OF SERVICE**

A true and correct copy of the foregoing Sentencing Memorandum will be served via the Court's Electronic filing system upon the persons listed therein.

/s/ J. Scott Broome
J. Scott Broome