**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.:    1:18CR735 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| MOHAMMAD H. MOHAMMAD, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER ON LOSS AMOUNT** |
| Defendant. | ) | |

## I.  INTRODUCTION

On December 12, 2018, Defendant Mohammad H. Mohammad ("Mohammad") was indicted for four counts of Filing False Tax Return in violation of 26 U.S.C. § 7206(1). (Indictment 1-3, ECF No. 1.) Specifically, Mohammad was indicted for: (1) filing a false individual tax return on March 12, 2013 for the 2012 calendar year; (2) filing a false individual tax return on February 16, 2014 for the 2013 calendar year; (3) filing a false partnership tax return on March 6, 2013 for the 2012 calendar year; (4) filing a false partnership tax return on February 16, 2014 for the 2013 calendar year. (*Id.*) On July 24, 2019, Mohammad pled guilty to the Indictment. (*See* Min. of Proceedings July 24, 2019; PSR ¶ 1, ECF No. 43.) No plea agreement was executed in this matter. (PSR ¶ 6, ECF No. 43.)

Pursuant to the 2018 United States Sentencing Guidelines ("Guidelines"), for the offenses of filing fraudulent or false tax returns the advisory sentence guideline range calculation depends, initially, upon the total tax loss amount. *See* U.S.S.G. § 2T1.1(a) (2018); U.S.S.G. § 2T4.1 (2018). The parties in this matter do not agree on the total tax loss amount – the government contends the total tax loss amount is $498,189 while Mohammad contends the total tax loss amount is, at most,

$118,455. (Def.'s Expert Report 3-4, 13, ECF No. 41-1; Gov.'s Resp. to Def.'s Expert Report 1, 4, 7, 15, ECF No. 41; Def.'s First Br. on Tax Loss 7, ECF No. 42; Jan. 13, 2020 Sentencing Hr'g Tr. 30:8, ECF No. 51; Def.'s Second Br. on Tax Loss 7, ECF No. 58; Gov.'s Resp. to Def.'s Br. on Tax Loss 1, 4, 11, ECF No. 60. *See generally* Def.'s Mot. for Oral Hr'g, ECF No. 34.)

This Court has considered the submitted written materials discussing the issues surrounding the total tax loss amount and the associated sworn witness testimony presented by both parties. For the reasons set forth in this Memorandum, this Court finds that the government has met its burden of proof and, therefore, the loss amount of $498,189, calculated pursuant to U.S.S.G. § 2T1.1(a)(1) (2018) and the associated application notes, and as applied to U.S.S.G. § 2T4.1 (2018), is the amount this Court will utilize as the total tax loss amount when sentencing Mohammad.

## II.  BACKGROUND

In 2009, the United States Department of Agriculture Office of Inspector General, in conjunction with state and local government agencies, identified Holyland Imported Foods, Inc. ("Holyland"), a specialty grocery store, as a business likely engaging in food stamp fraud. (*United States of America v. Mohammad, et al.*, Case No. 1:16-cr-00052, Jan. 25, 2018 Sentencing Hr'g Tr. 38:15-21, ECF No. 87. *See also* Def.'s Expert Report 2, ECF No. 41-1 (stating "Holyland is unique and unlike other grocery stores").) Holyland was identified as such because, over the course of several years, individuals admitted to exchanging foot stamp benefits for cash and other non-food items at Holyland – practices prohibited by the food stamp benefits program. (*United States of America v. Mohammad, et al.*, Case No. 1:16-cr-00052, Jan. 25, 2018 Sentencing Hr'g Tr. 38:21-25, ECF No. 87.) In addition, investigation discovered that some Cleveland business owners were utilizing food stamp benefits at Holyland to purchase inventory for their businesses – another practice prohibited by the food stamp benefits program. (*Id.* at 39:3-15, 46:19-47:9.) It was then

that cooperating witnesses were sent into Holyland where they ultimately engaged in fraudulent food stamp transactions with Holyland – i.e. exchanging food stamp benefits for non-food items; exchanging food stamp benefits for food items to be used at commercial establishments; allowing the use of multiple food stamp benefit cards, originally assigned to different individuals, for one purchase; and extending store credit for food stamp benefits to be used toward future purchases – all practices prohibited by the food stamp benefits program. (*See generally id.* at 48:3-65:13.)

Mohammad, along with his brother Omar Mohammad ("Omar"), were partners who established Muhammad Brothers Partners, which, in turn, owned and operated Holyland. (*Id.* at 49:22-23. *See also* PSR ¶¶ 8-9, ECF No. 43; Jan. 13, 2020 Sentencing Hr'g Tr. 5:24-6:7, ECF No. 51.) Accordingly, given the fraudulent food stamp transactions that occurred at Holyland with the cooperating witnesses, in October 2014, search warrants were executed at Holyland, Mohammad's home, and Omar's home. (Jan. 13, 2020 Sentencing Hr'g Tr. 5:6-12, ECF No. 51.) During the execution of the search warrant at Mohammad's home, multiple bags of Holyland receipts were located – enough to fill approximately four bankers' boxes. (*Id.* at 5:13-23, 6:8-7:14.)

Internal Revenue Service Special Agent Ellen Lacy ("Special Agent Lacy") inspected each Holyland receipt retrieved from Mohammad's home. (*Id.* at 3:23-4:24, 7:19-8:12.) During her inspection, Special Agent Lacy discovered that for each calendar day, typically two credit card machine receipts were saved as well as two cash register receipts – all from Holyland. (*Id.* at 7:19-8:9.) Special Agent Lacy found that all the saved receipts were grouped by week, and each grouping contained an "adding machine tape" with calculated totals and handwritten information. (*Id.* at 7:19-13:15.) For example, the calculated totals on the "adding machine tape" were labeled "checks", "credit card plus food stamp", "home total", "store total", and "difference". (*Id.* at 9:8-10:4.) Importantly, the total labeled "store total" on each "adding machine tape" equaled the total

sales entered into Holyland's cash registers, as confirmed by the saved cash register receipts. (*Id.* at 10:14-17, 11:5-7.) Additionally, Special Agent Lacy obtained statements from Holyland employees familiar with the business's operation which confirmed that all sales were entered into Holyland's cash registers – these statements established for Special Agent Lacy that the cash register receipts obtained from Mohammad's home accurately represented Holyland's daily sales. (*Id.* at 44:18-49:14. *See also* Jan. 27, 2020 Sentencing Hr'g Tr. 5:11-6:16, ECF No. 53; Gov.'s Resp. to Def.'s Expert Report 7-8, ECF No. 41.) Accordingly, Special Agent Lacy focused her tax investigation only on Holyland's cash register receipts. (Jan. 13, 2020 Sentencing Hr'g Tr. 13:23-15:5, ECF No. 51.)

Although the receipts retrieved from Mohammad's home dated back to 2003, there were not cash register receipts for every single day from 2003 through the date the search warrants were executed. (*Id.* at 12:23-13:3.) However, Special Agent Lacy did locate all or most of Holyland's daily cash register receipts for the years of 2012 and 2013, and therefore her investigation focused on the 2012 and 2013 cash register receipts. (*Id.* at 13:16-16:4, 16:10-17:22.) For specific days Special Agent Lacy did not locate cash register receipts, she utilized credit card sale information from World Pay – the credit card processor Holyland utilized during 2012 and 2013 – for a conservative daily sale estimate, as World Pay information reflected only credit card and food stamp sales made by Holyland but did not include cash or check sales. (*Id.* at 11:1-4, 16:12-15, 17:5-18:16.) Within this framework – analyzing the daily cash register receipts obtained from Mohammad's home, and the World Pay information only for days missing cash register receipts – Special Agent Lacy calculated Holyland's total yearly sale amount for 2012 and 2013, and then compared this total yearly sale amount to the amount claimed on Mohammad's filed federal tax

documents to determine if Mohammad failed to report income on his taxes. (*Id.* at 13:23-14:7, 17:5-18, 19:2-10.)

Importantly, for both 2012 and 2013, Mohammad filed partnership tax returns for Mohammad Brothers Partners, doing business as Holyland. (*Id.* at 19:11-17, 19:24-20:4.) Because the partnership itself does not pay income taxes, income claimed on the partnership tax return flowed through to the individual tax returns of the partners, Mohammad and Omar, based upon the ownership percentage of each partner for each year. (*Id.* at 25:21-25.) Accordingly, Special Agent Lacy determined that for 2012, Holyland made $4,139,360.53 in sales, but Mohammad only reported $3,656,160 in sales on the partnership tax return, resulting in a total of $483,200.53 of unreported income. (*Id.* at 18:17-18, 19:7-8, 19:11-23, 28:9-17. *See also* Gov.'s Resp. to Def.'s Expert Report 5, ECF No. 41.) Similarly, for 2013, Special Agent Lacy determined that Holyland made $5,323,561.06 in sales, but Mohammad only reported $4,256,154 in sales on the partnership tax return, resulting in a total of $1,067,407.06 of unreported income. (Jan. 13, 2020 Sentencing Hr'g Tr. 19:9-10, 19:24-20:7, 28:18-23, ECF No. 51. *See also* Gov.'s Resp. to Def.'s Expert Report 5, ECF No. 41.)

Given that the unreported income necessarily flows from the partnership tax returns to the individual tax returns in order to be properly taxed, Special Agent Lacy calculated that the total unreported taxable income for 2012 and 2013, per the Internal Revenue Code for 2012 and 2013, resulted in a total amount of tax due and owing of $498,189 – this amount was calculated only as a result of the unreported income from Holyland's sales, no other adjustments to Mohammad's 2012 or 2013 federal tax forms were made. (Jan. 13, 2020 Sentencing Hr'g Tr. 28:24-30:18, ECF No. 51. *See also* Gov.'s Resp. to Def.'s Expert Report 6-7, ECF No. 41.) Of note, Special Agent Lacy understood that Abdullah Jordan ("Jordan") prepared all of Mohammad's partnership and

individual tax returns for 2012 and 2013 utilizing only Holyland's bank statements and specific adjustments for cash transactions, as instructed by Mohammad, but not utilizing the receipts located in Mohammad's home, as Mohammad never told Jordan about the receipts or provided Jordan with the receipts. (Jan. 13, 2020 Sentencing Hr'g Tr. 20:8-25:1, ECF No. 51.)

To be clear, the charges brought against Mohammad for the aforementioned fraudulent food stamp transactions were prosecuted in *United States of America v. Mohammad, et al.*, Case No. 1:16-cr-00052, N.D. Ohio and are not further addressed or discussed herein. The present matter is before this Court only because fraudulent tax activity was discovered when analyzing the records obtained during the food stamp fraud investigation – as charged and pled guilty to, for the years of 2012 and 2013, Mohammad filed partnership tax returns and individual tax returns, verified by written declarations that the returns were filed under the penalties of perjury, despite knowing that the returns understated Mohammad's total income as he failed to accurately report the gross sales generated by Holyland in both 2012 and 2013. (Indictment 1-3, ECF No. 1.)

Accordingly, pursuant to the government's investigation and associated analysis, the government contends that the total amount of tax due and owing for 2012 and 2013 is $498,189. Mohammad, on the other hand, asserts that the government's reliance upon the Holyland cash register receipts located in his own home grossly overstates the sales generated by Holyland in 2012 and 2013, thereby overstating the amount of unreported income on Mohammad's 2012 and 2013 partnership and individual tax returns. Mohammad therefore contends, utilizing his own independent research and calculations, that the total amount of tax due and owing for 2012 and 2013 is, at most, $118,455. Given this discrepancy, the issue before this Court is whether the government has met its burden to prove, by a preponderance of the evidence, that utilizing the

Holyland cash register receipts located in Mohammad's home led to properly calculating the amount of tax due and owing for 2012 and 2013.

## III.  ANALYSIS

The first step in the criminal sentencing process is calculating the advisory sentence guideline range suggested by the United States Sentencing Commission. *See Rita v. United States*, 551 U.S. 338, 351 (2007) ("The sentencing judge, as a matter of process, will normally begin by considering the presentence report and its interpretation of the Guidelines."). In so doing, a court must determine the offense level for the crimes for which the defendant has been convicted and determine the defendant's criminal history category. *See United States v. Boyd*, No. 3:07-CR-3, 2008 U.S. Dist. LEXIS 94565, at *43-48 (E.D. Tenn. Nov. 18, 2008).

In the instant matter, the offense level for crimes committed in violation of 26 U.S.C. § 7206(1) is determined by utilizing the total tax loss amount. U.S.S.G. § 2T1.1(a)(1) (2018). *See also* U.S.S.G § 2T4.1 (2018). As stated previously, the parties disagree on this threshold issue – namely, the total tax loss amount. Once again, the government argues that the total tax loss amount, based upon Holyland's total yearly sales for 2012 and 2013 as determined by Holyland's daily cash register receipts, compared to the income actually claimed on Mohammad's 2012 and 2013 partnership and individual tax returns, is $498,189, which is more than $250,000 but less than $500,000, resulting in an offense level of 18 for Mohammad. U.S.S.G. § 2T4.1(G) (2018).

Mohammad, on the other hand, argues that the daily cash register receipts actually overstate Holyland's sales because: (1) the "void" function on the cash registers did not work properly; (2) the cash registers were used as adding machines; (3) Holyland allowed customers to make purchases on store credit; (4) the cash register receipts do not take into account cash back transactions; and (5) the cash register receipts do not take into account cash payments made to

vendors. (Def.'s Expert Report 5, ECF No. 41-1.) In addition, Mohammad argues that the sales amount calculated from the daily cash register receipts results in an unreasonably high profit percentage for Holyland. (*Id.*) Given these arguments, Mohammad asserts that his total tax loss amount is no more than $118,455, which is more than $100,000 but less than $250,000 resulting in an offense level of 16. U.S.S.G. § 2T4.1(F) (2018).

1.  Standard of Review

The base requirement for calculating the total tax loss amount is that a "district court 'need only make a reasonable estimate of the loss.'" *United States v. Olive*, 804 F.3d 747, 758 (6th Cir. 2015) (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)). *See also* U.S.S.G. § 2T1.1 cmt. n.1 (2018) (stating "the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts"). Accordingly, "[l]oss need not be determined with precision." *United States v. Milligan*, 17 F.3d 177, 183 (6th Cir. 1994). Finally, this Court's reasonable estimate of the total tax loss amount must be made by a preponderance of the evidence. *United States v. Daulton*, 266 F. App'x 381, 388 (6th Cir. 2008) ("the sentencing court 'only need[s] to determine the amount of loss by a preponderance of the evidence.'") (quoting *United States v. Blackwell*, 459 F.3d 739, 772 (6th Cir. 2006)).

2.  Calculating Total Tax Loss Amount

In considering the applicable written materials submitted by the parties and the sworn testimony presented in this matter, this Court finds that the government has proven, by a preponderance of the evidence, that the calculated total tax loss amount of $498,189 is a reasonable estimate of the total tax loss for 2012 and 2013 based upon the available facts. Once again, for clarity, in reaching the $498,189 figure, the government utilized Holyland records obtained from Mohammad's home – specifically Holyland's daily cash register receipts. The government

confirmed that the cash register receipts were a reliable source of Holyland's sales by learning, directly from Holyland employees who operated the cash registers, that the cash registers were utilized to accurately record Holyland's sales.[1] In addition, the records obtained from Mohammad's home annotated, in handwriting, that the cash register receipts reflected the "store total." Finally, the government learned that Mohammad's 2012 and 2013 partnership and individual tax documents were prepared utilizing only Holyland's bank account statements.

Armed with this information, the government understood that Mohammad's 2012 and 2013 partnership and individual tax returns were likely incorrect as any earnings from sales not deposited directly in Holyland's bank account, which likely included cash sales at the least, were not reflected on Mohammad's tax returns. Because the government understood the cash register receipts obtained from Mohammad's home accurately reflected Holyland's sales, it reasonably calculated Holyland's sales amounts for 2012 and 2013 utilizing those receipts. Thereafter, a comparison of the calculated yearly sales amount for 2012 and 2013 to the amount of income claimed on Mohammad's 2012 and 2013 partnership and individual tax returns revealed that Mohammad underreported his income and, therefore, failed to pay the entire amount of taxes he owed.

---

[1] Of note, the government contends that Alaa Mohammad ("Alaa"), Mohammad's son, provided testimony confirming that only sales of goods are entered into Holyland's cash registers, which, in turn, confirmed that the cash register receipts accurately reflect Holyland's sales. (*See* Gov.'s Resp. to Def.'s Expert Report 7-8, 10-11, ECF No. 41; Gov.'s Resp. to Def.'s Br. on Tax Loss 9-10, ECF No. 60.) However, at the December 5, 2019 sentencing hearing before this Court, Alaa testified that he did not understand the questions asked of him which resulted in his testimony that only sales of goods are entered into Holyland's cash registers – effectively winding back his assertion that the cash register receipts accurately reflect Holyland's sales. (Dec. 5, 2019 Sentencing Hr'g Tr. 94:4-95:17, ECF No. 52.) At the same sentencing hearing before this Court, Alaa also admitted to lying under oath. (*Id.* at 110:25-116:21.)

It is this Court's view that Alaa is not credible. However, the government interviewed multiple Holyland employees to conclude that Holyland's cash registers were utilized to accurately record Holyland's sales. (*See* Jan. 13, 2020 Sentencing Hr'g Tr. 44:18-49:25, ECF No. 51.) Therefore, Alaa's lack of credibility does not negate the government's confirmation that Holyland's cash registers were utilized to accurately record Holyland's sales, therefore making Holyland's cash register receipts reliable in calculating Holyland's sales.

This Court also finds that the government's $498,189 figure is a reasonable estimate because it is conservative. For dates in 2012 missing cash register receipts, the government simply utilized the sales information from the World Pay system – the system which only tracks credit card and food stamp transactions at Holyland. Therefore, for those dates where only World Pay information was utilized, no cash sales were included in the daily sales total. In addition, the government only adjusted unreported income on Mohammad's 2012 and 2013 tax documentation as supported by the calculations from the cash register receipts retrieved from Mohammad's home – no other adjustments were made.

In sum, because the calculations performed by the government are supported by documentation directly from Holyland, the government received reliability statements from Holyland employees regarding the documentation, the government learned that Mohammad's 2012 and 2013 partnership and individual tax returns were prepared utilizing only Holyland's banking records, and the government's approach to determine the total tax loss amount was conservative, even if the $498,189 is not the precise total tax loss amount, it is a very reasonable number.

Mohammad, however, argues against this reasonable number by presenting a variety of arguments for why the cash register receipts retrieved from his home are inaccurate and should not be utilized to calculate Holyland's sales for 2012 and 2013. Each of Mohammad's arguments will be addressed in turn.

### a) Cash Register Void Function

Mohammad first argues that Holyland's cash register receipts are incorrect, and therefore unreliable for determining Holyland's sales, because the void function on Holyland's cash registers did not work properly. (Def.'s Expert Report 5, ECF No. 41-1.) Mohammad argues that this malfunction caused the cash register receipts to include items that were ultimately not sold because

they were either rung up incorrectly or ultimately not purchased for some other reason, thereby inflating the actual sales numbers. (*Id.*) However, the government's review of the cash register receipts found that the void function on the cash registers was frequently used and the cash register receipts reflected that use. (Jan. 13, 2020 Sentencing Hr'g Tr. 30:25-33:3, ECF No. 51. *See also* Gov.'s Resp. to Def.'s Expert Report 8-9, ECF No. 41.) Therefore, because the cash register receipts reflected the frequent use of the void function, this Court does not find Mohammad's argument that the cash register receipts provide inflated sales numbers due to an improperly working void function persuasive.

**b) Cash Register Used as an Adding Machine and "No Sale" Function**

Mohammad also argues that the cash register receipts are incorrect because the cash registers were often used as adding machines. (Def.'s Expert Report 5-6, ECF No. 41-1.) Mohammad provides that the cash registers were used as adding machines when a customer requested a total amount for their selected grocery items, but then opted not to purchase all the items. (*Id.*) In those instances, Mohammad claims the originally requested total provided to the customer was not voided, and instead, a second sale for the items actually sold to the customer was entered into the cash register, thereby double counting the sale – one cash register receipt entry for the customer requested total which was not ultimately sold, and one cash register receipt entry for the actual sale made. (*Id.*)

However, as discussed previously, the void function on the cash registers was used. (*See* Jan. 13, 2020 Sentencing Hr'g Tr. 30:25-33:3, ECF No. 51. *See also* Gov.'s Resp. to Def.'s Expert Report 8-9, ECF No. 41.) In addition, the government, in reviewing the cash register receipts, identified that "no sales" were also rung up on the cash registers every single day. (Jan. 13, 2020 Sentencing Hr'g Tr. 33:4-34:2, ECF No. 51.) In other words, when a customer requested a total

amount for selected items but ultimately did not purchase all the items, the "no sale" function on the register was used and the added total was not counted as a sale on the cash register receipt. (*Id.* at 33:16-34:2. *See also* Gov.'s Resp. to Def.'s Expert Report 9, ECF No. 41.) Therefore, because the cash register receipts reflected the use of the void function and the "no sale" function, this Court does not find Mohammad's argument that the cash register receipts provide inflated sales numbers because items that were ultimately not purchased were still reflected as sales on the cash register receipts persuasive.

### c) Holyland's Store Credit System

Mohammad also argues that the Holyland's practice of extending store credit to customers resulted in the cash register receipts incorrectly reflecting Holyland's actual sales. (Def.'s Expert Report 6-7, ECF No. 41-1.) As Mohammad explains Holyland's store credit system in 2012 and 2013, if a customer wished to purchase $100 worth of groceries on Monday, but was unable to pay for the purchase, the entire $100 worth of groceries was rung into the cash register as if Holyland had made a sale, but Holyland would actually extend $100 in credit to the customer and record the $100 the customer owed into a notebook. (*See id.*) On Tuesday, the same customer, purchasing another $100 worth of groceries, would pay $200 total to make their "account" current and pay in full for Tuesday's purchase. (*See id.*)  The transaction on Tuesday was entered into the cash register as a $200 sale – $100 from the notebook for Monday's items and $100 for Tuesday's items. (*See id.*) In other words, between Monday and Tuesday, this customer only purchased a total of $200 worth of goods from Holyland, but the cash register receipts would actually reflect $300 in sales because the $100 store credit from this customer's Monday purchase was counted twice, once on Monday and once on Tuesday. (*See id.*) Mohammad argues that Holyland's store credit system,

therefore, resulted in an inflated sale amount on the cash register receipts by a few thousand dollars every single week. (*See id.*)

However, the experiences of the cooperating witnesses during the food stamp fraud investigation of Holyland are instructive. According to the transaction records from the cooperating witnesses, Holyland's store credit system worked in two ways: (1) if a customer did not have enough money to purchase all the groceries he needed, Holyland would extend credit to that customer and allow him to make payment for the groceries later; and (2) Holyland would allow a customer to pay in advance and use the advance at a later time to buy groceries. (Jan. 13, 2020 Sentencing Hr'g Tr. 34:3-35:15, ECF No. 51.)

In both situations, however, Holyland's cash register receipts would only reflect the actual purchase of goods. For example, if a customer wanted to purchase $100 worth of groceries, but only had $50 available to pay, the $100 sale of goods was entered into the cash register, $50 was taken as payment, and the $50 owing was written down in a separate notebook. (*Id.* at 37:1-12. *See also* Jan. 27, 2020 Sentencing Hr'g Tr. 9:6-9:23, ECF No. 53.) Later, when the customer returned to pay off the $50 owed to Holyland, this $50 transaction was not rung into the cash register because there was no sale of $50 worth of goods. (Jan. 13, 2020 Sentencing Hr'g Tr. 37:22-38:9, ECF No. 51. *See also* Gov.'s Resp. to Def.'s Expert Report 9-10, ECF No. 41.)

For the second type of store credit Holyland allowed, if a customer wanted to purchase $100 worth of groceries, but wished to pay $100 in advance, typically from a food stamp card, Holyland would enter the $100 sale of goods into the cash register, but charge the customer $200 on the credit card machine and write down the customer's $100 advance in a separate notebook for application to later purchases. (Jan. 13, 2020 Sentencing Hr'g Tr. 34:20-36:25, 37:22-38:12, ECF No. 51. *See also* Jan. 27, 2020 Sentencing Hr'g Tr. 9:24-10:13, ECF No. 53; Gov.'s Resp. to Def.'s

Expert Report 9-10, ECF No. 41.) These later purchases, even if paid for by the advanced funds, would be rung into the cash register because they were sale of goods. (Jan. 13, 2020 Sentencing Hr'g Tr. 35:16-36:7, ECF No. 51.)

Regardless of whether a customer was asking for store credit because they could not pay for the total amount of goods needed, or was advancing funds for future purchases, the important documentation to focus on is the cash register receipts. As demonstrated by the experiences of the cooperating witnesses who engaged transactions involving Holyland's store credit system, the cash register receipts only ever reflected the actual goods sold – even if the credit card machine receipts reflected a different amount because the customer paid off store credit or advanced funds for future use utilizing a credit card or food stamp card. (Gov.'s Resp. to Def.'s Expert Report 9-10, ECF No. 41.) Because the government only utilized the cash register receipts when calculating Holyland's sales amount, the double counting that may or may not have occurred on the credit card machine receipts is irrelevant. The cash register receipts did not improperly record sales as they only recorded the goods actually sold. Therefore, this Court does not find Mohammad's argument that Holyland's store credit system caused the cash register receipts to improperly reflect actual goods sold resulting in double counting of sales persuasive.

### d) Cash Back Transactions

Mohammad next asserts that the cash register receipts incorrectly reflect Holyland's sales because cash back transactions were rung into the cash register as sales. (Def.'s Expert Report 7-9, ECF No. 41-1.) In fact, Mohammad claims that he typically provided between $500 to $1,000 in cash back to customers every single day, and since these transactions were entered as sales, Holyland's cash register receipts overstated Holyland's actual sales by hundreds of thousands of dollars per year. (*Id.*)

This Court, however, finds Mohammad's argument problematic. Besides his own statement, Mohammad provides no evidentiary support for his claim that he provided between $500 to $1,000 in cash back to customers every single day in 2012 and 2013. In fact, upon the government's review, Holyland's records do not indicate that cash back was given for any transaction, even though World Pay – the credit card processor Holyland utilized during 2012 and 2013 – typically reflects when cash back is given. (Jan. 13, 2020 Sentencing Hr'g Tr. 38:25-39:15, ECF No. 51; Jan. 27, 2020 Sentencing Hr'g 6:17-7:23, ECF No. 53.) As an alternative to evidence supporting Mohammad's argument, Mohammad's expert witness determined that an average of 30 customers per day in 2012 and 45 customers per day in 2013 purchased more than $50 worth of goods from Holyland with a debit or credit card. (Def.'s Expert Report 8, ECF No. 41-1.) The expert witness then assumed that Holyland gave $20 cash back to every customer who purchased more than $50 worth of goods from Holyland with a debit or credit card over the entire year, which resulted in an estimate that the cash register receipts reflected $222,285 in cash back transactions for 2012 and $329,827 in cash back transactions for 2013 since Mohammad stated that cash back transactions were rung as sales in Holyland's cash registers. (*Id.* at 8.) In the alternative, Mohammad's expert witness opined, utilizing numbers gathered from three studies and Mohammad's own statements, that 25% of debit card transactions and 5% of credit card transactions in 2012 and 2013 included cash back transactions with an average of $33 cash back for each transaction resulting in the cash register receipts reflecting $217,405 in cash back transactions for 2012 and $258,909 in cash back transactions for 2013. (*Id.* at 8-9.)

Once again, the main problem with these opinions is that they are based upon generalized statistics and Mohammad's own assertions regarding the frequency Holyland engaged in cash back transactions with customers and that cash back transactions were rung as sales in the cash register.

In fact, in direct contradiction of the expert witness's assumption that every customer who purchased more than $50 worth of goods from Holyland with a debit or credit card received $20 cash back, the aforementioned cooperating witnesses engaged in multiple transactions involving more than $50 worth of goods and never received cash back. (Gov.'s Resp. to Def.'s Expert Report 11-12, ECF No. 41.) This Court also finds it contradictory that the cash register receipts only ever reflected the actual goods sold for transactions involving Holyland's store credit system, even if the credit card machine receipts reflected a different amount, but for cash back transactions Holyland was not as careful or sophisticated and entered cash back transaction as sales even though no actual goods were sold. The preponderance of the evidence suggests that Holyland was careful to ensure that the cash register receipts only reflected goods sold, therefore, including cash back transactions as a sale in the cash register receipts does not follow the logic of the evidence, especially given that cash back to a customer is just change – i.e. customer purchases $10 worth of groceries and requests $40 cash back: Holyland records the $10 sale of goods in the cash register, but the customer pays $50 on his credit or debit card, this results in $40 in change to the customer. (Jan. 13, 2020 Sentencing Hr'g Tr. 38:25-39:15, ECF No. 51.) For all these reasons, this Court does not find Mohammad's argument that the cash register receipts incorrectly reflect Holyland's sales because cash back transactions were rung into the cash register as sales persuasive.

### e) Cash Payments to Vendors

Mohammad next argues that the cash register receipts overstated Holyland's sales because cash payments made to vendors were taken out of the cash registers but not subtracted from the cash register receipts. (Def.'s Expert Report 9, ECF No. 41-1.) This Court, however, fails to see the merit in this argument. The government did not adjust expenses on Mohammad's taxes to reach

the $498,189 amount of taxes due and owing. (Gov.'s Resp. to Def.'s Expert Report 12-13, ECF No. 41.) The government determined the amount of unreported income only from Holyland's sales in 2012 and 2013. Taking cash out of a register to pay a vendor does not impact the amount of sales Holyland made in 2012 and 2013. (*See* Jan. 13, 2020 Sentencing Hr'g Tr. 39:16-40:3, ECF No. 51; Gov.'s Resp. to Def.'s Expert Report 12-13, ECF No. 41.) Put another way, taking cash out of the register to pay a vendor does not negate the sale of goods that occurred to put the cash into the register. Therefore, this Court does not find Mohammad's argument that the cash register receipts overstate Holyland's sales because cash payments made to vendors were not subtracted from the cash register receipts persuasive.

### f) Profitability Argument

Mohammad's final argument is that the government's calculation of Holyland's sales, based upon the cash register receipts, results in net profit percentages of 13% in 2012, and 20% in 2013, which, according to Mohammad's expert witness, is "unreasonably high" when compared to industry standard net profit percentage for grocery stores and supermarkets in the United States. (Def.'s Expert Report 9-10, ECF No. 41-1.) The expert witness asserts that net profits of 5% for 2012 and 7% for 2013 are more reasonable for a store with a "specialty nature" such as Holyland. (*Id.* at 10.) To reach these more "reasonable" profit percentages, Mohammad's expert witness adjusted Holyland's sales figures by cash back transactions, cash payments to vendors, and bank funds used to cash checks. (*Id.*) With these mathematics, Mohammad's expert witness opined that the taxes due and owing in this matter are only $118,455 total, at most, for 2012 and 2013. (*Id.* at 10-13.)

This Court believes there are many issues with the assumptions that Mohammad's expert makes to reach this number. First, it seems disingenuous for Mohammad's expert witness to

describe Holyland as a specialty store throughout his report and in the same breath opine that Holyland's net profit percentages should be closer to the industry standard net profit percentage for United States grocery stores. This Court is especially troubled by this because Mohammad's expert witness argued, in the food stamp fraud case against Mohammad, that the government failed to consider the "size of the stores, volume of sales . . ., product sales makeup, demographics, and clientele" when comparing Holyland to other grocery stores in order to calculate the dollar of amount of food stamp fraud in which Holyland likely engaged. (Def.'s 16CR00052 Expert Report 2-4, ECF No. 41-2.) It appears to this Court that assigning a net profit percentage for Holyland based upon industry standards fails to consider the same details Mohammad's expert witness accused the government of failing to consider when food stamp fraud was the issue.

In addition, with respect to Holyland's net profit percentage, Mohammad takes issue with the government's failure to cite independent, objective research supporting the calculated net profit percentages for Holyland of 13% for 2012 and 20% for 2013, and failure to acknowledge the generalized statements made by various courts that United States grocery stores operate with low profit margins. (*See* Def.'s First Br. on Tax Loss 10-15, ECF No. 42; Def.'s Second Br. on Tax Loss 3-4, 6-7, ECF No. 58.) Mohammad's arguments, however, fail to appreciate that the government actually had Holyland records at its disposal to determine Holyland's sales with a reasonable degree, thereby avoiding the need to engage in generalized statistical analysis or reliance upon independent research unrelated to Holyland.

Furthermore, the record demonstrates that Holyland is a specialty store which engages in sales practices that nearly no other grocery store engages – such as selling bulk fresh meat items, accounting for between 50-60% of Holyland's sales, and maintaining less than 1% of sales on non-food items. (*See* Def.'s Expert Report 3, ECF No. 41-1; Dec. 5, 2019 Sentencing Hr'g Tr. 52:1-

25, ECF No. 52.) In fact, Mohammad's expert witness testified, and this Court agrees, that given Holyland's specialty nature, catering to certain dietary restrictions and culturally specific cuisine, Holyland is not directly comparable to other stores in the grocery industry and the best way to analyze Holyland is by looking at Holyland itself – which is precisely what the government did in analyzing Holyland's cash register receipts to determine Holyland's sales for 2012 and 2013. (Dec. 5, 2019 Sentencing Hr'g Tr. 52:1-55:16, ECF No. 52.)

Even setting these points aside, this Court still takes issue with Mohammad's expert witness's method of calculating the taxes due and owing. Mohammad's expert witness fails to lay any foundation regarding the adjustments he seemingly arbitrarily made to Holyland's sales to reach his $118,455 figure of taxes due and owing. (*See* Gov.'s Resp. to Def.'s Expert Report 13-15, ECF No. 41.) The expert witness's report states that he adjusted Holyland's sales by cash back transactions, cash payments to vendors, and by beginning bank funds without any rationale or explanation regarding the numbers used. This Court has previously discussed the pitfalls of Mohammad's arguments that Holyland's cash register receipts overstate Holyland's sales because they include cash back transactions and cash payments to vendors. But it is also completely unclear why Mohammad's expert witness adjusted Holyland's sales by beginning bank funds. The expert witness only explains that beginning bank funds are "not derived from new income" but rather is "carryover cash from the previous year used to cash checks into the following year." (Def.'s Expert Report 10, ECF No. 41-1.) This statement, however, does not explain the adjustments made or provide foundation for why they were made. As a final point, Mohammad's expert witness takes the time to argue that Holyland's cash register receipts overstate Holyland's actual sales because the void function did not work properly, the cash registers were used as adding machines, and because Holyland's store credit system resulted in sales being double counted. However, the expert

witness did not adjust Holyland's sales for these reasons – only for cash back transactions and cash payments to vendors.

Mohammad's expert witness's calculations, "alternative analysis", speculations, and opinions based upon generalized research, Mohammad's own statements which lack evidentiary support, and the unclear adjustments to Holyland's sales figures, simply do not create doubt for this Court regarding the government's calculations. (*See* Dec. 5, 2019 Sentencing Hr'g Tr. 27:9-37:25, 55:20-57:10, 57:23-58:5, 58:18-59:9, 62:4-62:13, 64:15-67:2, ECF No. 52.) The government utilized documentation produced by the cash registers at Holyland and kept in Mohammad's home. Holyland employees verified the accuracy of the sales reflected in the cash register receipts. The government took a conservative approach calculating Holyland's sales and only adjusted Mohammad's tax returns by the unreported sales amounts as calculated by Holyland's cash register receipts for 2012 and 2013. The figures and statistic proffered by Mohammad's expert witness do little to undermine the evidence found in his own home and the reasonableness of the government's determination that the total tax loss amount in this matter is $498,189.

3. <u>2018 United States Sentencing Guidelines</u>

The final issue to address is the application of the 2018 Guidelines to this matter. Of course, this Court recognizes that Mohammad committed the offenses before this Court in 2013 and 2014, was indicted for these offenses in 2018, and the sentencing proceedings in this case began in 2019 and continued in 2020. Despite the span of time involved in this matter, this Court will apply the 2018 Guidelines because "[a] district court generally applies the version of the Sentencing Guidelines in place at the time of sentencing unless applying the current version would amount to a violation of the *Ex Post Facto* Clause." *United States v. Welch*, 689 F.3d 529, 532-33 (6th Cir. 2012) (citing *United States v. Kussmaul*, 987 F.2d 345 (6th Cir. 1993)). To determine whether such

violation exists, this Court "must compare the application of the Guidelines as they existed on the date the offense was committed with the application of the Guidelines in place on the day of sentencing." *Welch*, 689 F.3d at 533 (citing *Kussmaul*, 987 F.2d at 350).

As previously acknowledged, Mohammad committed two offenses in March 2013, when the 2012 Guidelines were in effect, and two offenses in February 2014, when the 2013 Guidelines were in effect. *See generally* United States Sentencing Commission, *Guidelines Manual* (Nov. 2012); United States Sentencing Commission, *Guidelines Manual* (Nov. 2013). His sentencing began in 2019 and continued into 2020 when the 2018 Guidelines were in effect. (*See generally* Marginal Entry Order Oct. 30, 2019, ECF No. 40; Dec. 5, 2019 Sentencing Hr'g Tr., ECF No. 52; Jan. 13, 2020 Sentencing Hr'g Tr., ECF No. 51; Jan. 27, 2020 Sentencing Hr'g Tr., ECF No. 53.) *See also* United States Sentencing Commission, *Guidelines Manual* (Nov. 2018).

Therefore, looking to the 2012 Guidelines, the 2013 Guidelines, and the 2018 Guidelines, all three instruct that the base offense level for crimes committed in violation of 26 U.S.C. § 7206(1) is determined, initially, by the total tax loss amount as indicated in a tax table. *See* U.S.S.G. § 2T1.1(a)(1) (2012) and associated commentary; U.S.S.G. § 2T1.1(a)(1) (2013) and associated commentary; U.S.S.G. § 2T1.1(a)(1) (2018) and associated commentary. Because this Court determined that the total tax loss amount is $498,189, looking to the 2012 and 2013 Guidelines tax tables, Mohammad's base offense level would be 20 as the total tax loss amount is more than $400,000 but less than $1,000,000. *See* U.S.S.G. § 2T4.1(H) (2012); U.S.S.G. § 2T4.1(H) (2013). However, looking to the 2018 Guidelines tax table, Mohammad's base offense level would be 18 as the total tax loss amount is more than $250,000 but less than $550,000. *See* U.S.S.G. § 2T4.1(G) (2018). "If a revision of the Guidelines 'changes the legal consequences of acts completed before its effective date to the detriment of the [defendant], the Guidelines in effect at the time of the

criminal act must be applied.'" *Welch*, 689 F.3d at 533 (quoting *Kussmaul*, 987 F.2d at 351-52). In this instance, utilizing the 2012 Guidelines and the 2013 Guidelines would be to the detriment of Mohammad as his base offense level would be 20 as opposed to a base offense level of 18 under the 2018 Guidelines. Therefore, the 2018 Guidelines were utilized throughout this Opinion and shall be utilized for the remainder of any sentencing proceedings conducted by this Court.

Finally, as a brief note, the 2012 Guidelines, 2013 Guidelines, and 2018 Guidelines all comment that in determining the total tax loss amount, "the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts." U.S.S.G. § 2T1.1 cmt. n.1 (2012); U.S.S.G. § 2T1.1 cmt. n.1 (2013); U.S.S.G. 2T1.1 cmt. n.1 (2018).

## IV. CONCLUSION

Therefore, for all the reasons enumerated throughout this memorandum, this Court finds that the total tax loss amount, calculated pursuant to U.S.S.G. § 2.T1.1(a)(1) (2018), is $498,189. More specifically, this Court holds that the government has met its burden to prove, by a preponderance of the evidence, that the total tax loss amount of $498,189 is reasonable as the government determined this total tax loss amount by analyzing Holyland's cash register receipts, which were kept in Mohammad's home, after confirming that Holyland's cash registers were used to properly record Holyland's sales. This Court finds that the arguments put forth by Mohammad to dispute the reliability of Holyland's cash register receipts are not persuasive.

Finally, because this Court finds the total tax loss amount as $498,189, pursuant to U.S.S.G. § 2T4.1(G) (2018), Mohammad's offense level is 18. Of note, the parties have put forth arguments regarding Mohammad's criminal history and how this Court should view previous convictions during sentencing, arguments which are not addressed in this Memorandum of Opinion. Therefore, Mohammad's criminal history category, Mohammad's sentencing guideline range, and all 18

U.S.C. § 3553(a) factors will be addressed at the sentencing hearing and are not discussed herein. This Memorandum of Opinion only concludes, for sentencing purposes, that Mohammad's offense level is 18.

IT IS SO ORDERED.

DATE: July 8, 2020                           /s/ John R. Adams
                                             Judge John R. Adams
                                             UNITED STATES DISTRICT COURT